UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES F. MCGRATH, JR.,

                        Plaintiff,

       v.

THOMSON REUTERS,

                       Defendant.

Case No. 10-cv-4944-JSR-JCF

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT THOMSON REUTERS'
MOTION FOR SUMMARY JUDGMENT**

Dated: January 6, 2012
      New York, New York

Respectfully Submitted,

JACKSON LEWIS LLP
220 Headquarters Plaza,
East Tower, 7th Floor
Morristown, New Jersey 07960
(973) 538-6890

666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

By:    /s/ Mitchell Boyarsky
           Mitchell Boyarsky (MB 7995)
           Valerie J. Bluth (VB 4246)

ATTORNEYS FOR DEFENDANT
THOMSON REUTERS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iv-x

PRELIMINARY STATEMENT .......................................................................................... 1

FACTS ................................................................................................................................ 4

ARGUMENT ...................................................................................................................... 4

POINT I:   PLAINTIFF'S CLAIMS WHICH AROSE PRIOR TO AUGUST 14, 2008 ARE
UNTIMELY. ...................................................................................................... 4

POINT II:   PLAINTIFF'S CLAIMS OF DISCRIMINATION BASED ON AGE, RELIGION
AND DISABILITY SHOULD BE DISMISSED AS A MATTER OF LAW. ...... 5

    A.   Plaintiff Cannot Establish a Prima Facie Case of Discrimination Based on Age,
Religion or Disability. ............................................................................................ 6

        1.   Plaintiff's Age and Religious Discrimination Claims. ............................... 6

            a.   Plaintiff Did Not Perform His Duties in a Satisfactory Manner
Prior to His Separation. .................................................................... 7

            b.   Plaintiff Received a PIP in April 2009. ........................................... 9

            c.   Plaintiff Did Not Suffer Any Adverse Employment Action. ......... 10

                i.   Alleged Demotion. ............................................................ 11

                ii.   Reassignment of Clients While Plaintiff Was On Six
Weeks of Medical Leave. .................................................. 13

                iii.   Unsatisfactory Performance Evaluation. .......................... 14

                iv.   Coaching and Counseling by Sharma. .............................. 16

                v.   April 2009 Performance Improvement Plan. ..................... 17

                vi.   Plaintiff's Termination. ..................................................... 17

            d.   No Alleged Adverse Employment Action Occurred Under
Circumstances Giving Rise to an Inference of Discrimination
Based on Age or Religion. .............................................................. 19

                i.   No Inference of Discrimination Exists Based on Age. ..... 19

            e.   Plaintiff Cannot Meet the "But-For" Standard for an Age Claim. 22

            f.   No Inference of Discrimination Exists Based on Religion. .......... 23

        2.   Plaintiff's Disability Discrimination Claim. ............................................ 24

            a.   Plaintiff did not Suffer an Adverse Employment Action. ............. 24

            b.   Plaintiff Was Not Disabled Within the Meaning of the ADA
During his Active Employment. ..................................................... 25

                i.   Plaintiff Could Not Perform the Essential Functions of His
Job Beginning in May 2009. ............................................. 26

B.    Plaintiff is Unable to Assert a Failure to Accommodate Claim............................. 27

    1.    Plaintiff Was Not Disabled within the Meaning of the ADA................. 27

    2.    Plaintiff Did Not Request an Accommodation. ......................................... 28

POINT III:    DEFENDANT ARTICUALTED A LEGITIMATE BUSINESS REASON FOR EACH ALLEGED ADVERSE EMPLOYMENT ACTION............................... 29

A.    Reassignment of Clients While Plaintiff was on Leave was Designed to Continue Client Services and was Consistent with Treatment of Plaintiff's Co-Worker. ... 29

B.    2008 Review Reflected Recent Poor Sales Activities. .......................................... 30

C.    April 2009 PIP was a Response to Plaintiff's Abysmal Sales Performance in 2009.............................................................................................................. 30

D.    Sharma Provided Coaching and Counseling to Rehabilitate Plaintiff. ................. 31

E.    Defendant Separated Plaintiff After He Failed to Engage in the Interactive Process to Accommodate Plaintiff........................................................................ 31

POINT IV:    PLAINTIFF CANNOT PROVE THAT DEFENDANT'S LEGITIMATE BUSINESS REASONS WERE ACTUALLY A PRETEXT FOR DISCRIMINATION. ................................................................................ 33

A.    Conclusory Allegations Cannot be Used to Show Pretext..................................... 34

B.    Plaintiff Cannot Show Pretext Through Comparative Evidence. ......................... 34

POINT V:    PLAINTIFF CANNOT PROVE THAT HE WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED ON HIS AGE, RELIGION OR DISABILITY. ................................................................................................ 35

A.    Plaintiff's Hostile Work Environment Age Claim is Based Solely on Sonders' "Old Man" Comments, Which Fail as a Matter of Law. ....................................... 37

B.    Plaintiff's Hostile Work Environment Claim Based on Disability is Legally Unsustainable.................................................................................................... 38

    1.    The Nature and Circumstances Surrounding the Alleged Comments do not Support Plaintiff's Hostile Work Environment Claim............................... 38

    2.    Plaintiff Failed to Link any Hostility to his Conditions of Employment.. 39

C.    In the Spring of 2009 Sonders Authorized a Bonus to Plaintiff He Did Not Deserve. .......................................................................................................... 40

D.    "Atheist Comment" by Ramos Cannot Establish a Hostile Work Environment.. 41

POINT VI:    PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT RETALIATED AGAINST HIM DUE TO HIS COMPLAINT OF DISCRIMINTION. ............. 41

POINT VII:    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE DISCRIMINATION CLAIMS BECAUSE IT EXCERCISED REASONABLE CARE TO PREVENT AND TO PROMPTLY CORRECT DISCRIMINATION, HARASSMENT AND RETALIATION. ............................................................ 44

POINT VIII:    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE HE HAS SUFFERED NO DAMAGES. ............................................................................ 47

POINT IX:    PLAINTIFF IS NOT ENTITLED TO DAMAGES AFTER OCTOBER 4, 2011
             BASED ON AFTER-ACQUIRED EVIDENCE. .................................................. 47

CONCLUSION ........................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adams v. Northstar Location Servs.,
   2010 WL 3911415 (W.D.N.Y. October 4, 2010) ...................................................13

Alfano v. Costello,
   294 F.3d 365 (2d Cir. 2002)...............................................................................39

Beyer v. County of Nassau,
   524 F.3d 160 (2d Cir. 2008)...............................................................................12

Bickerstaff v. Vassar Coll.,
   196 F.3d 435 (2d Cir.1999)................................................................................20

Blanco v. Brogan,
   620 F.Supp.2d 546 (S.D.N.Y. 2009)...................................................................42

Bonura v. Chase Manhattan Bank, NA.,
   629 F.Supp. 353 (S.D.N.Y.1986), aff'd, 795 F.2d 276 (2d Cir.1986) ...................47

Burlington Indus. Inc. v. Ellerth,
   524 U.S. 742, 118 S. Ct. 2257 (1998).................................................................45

Byrnie v. Town of Cromwell Bd. of Educ.,
   243 F.3d 93 (2d Cir. 2001).................................................................................15

Carpenter v. City of Torrington,
   No. 03-9194, 2004 WL 1292756 (2d Cir. June 10, 2004)......................................16

Carter v. New Venture Gear, Inc.,
   No. 07-4672-cv, 2009 WL 393611 (2d Cir. Feb. 18, 2009) ...................................32

Carter v. New York City Dep't of Corr.,
   No. 00-CV-7118, 2001 WL 345170 (2nd Cir. Apr.5, 2001) ..................................17

Clark County Sch. Dist. v. Breeden,
   532 U.S. 268 (2001)..........................................................................................43

Cleveland v. Policy Mgmt Sys. Corp.,
   526 U.S. 795, 119 S. Ct. 1597 (1999).................................................................27

Coleman v. Prudential Relocation,
   975 F.Supp. 234 (W.D.N.Y.1997)......................................................................20

Collins v. New York City Transit Auth.,
 305 F.3d 113 (2d Cir. 2002)............................................................................6, 10

De La Cruz v. City of New York,
 783 F. Supp. 2d 622 (S.D.N.Y. 2011)............................................................10, 39

De La Rosa v. City of New York Police Dep't,
 No. 09-CV-5290 (SAS), 2010 WL 4177626 (S.D.N.Y. Oct. 22 2010) ...........25, 40

Deabes v. Gen. Nutrition Corp.,
 No. 10-1742-cv, 2011 WL 1054028 (2d Cir. Mar. 24, 2011)................................33

DelaPaz v. N.Y. City Police Dep't,
 No. 01-CV-5416 (CBM), 2003 WL 21878780 (S.D.N.Y. Aug. 30, 2003) ............37

DiFillippo v. Special Metals Corp.,
 No. 09-CV-760, 2011 WL 4595204 (N.D.N.Y. Sept. 30, 2011) ...........................25

Ehmann v. Good Samaritan Hospital Medical Center,
 2010 N.Y. Misc. LEXIS 4577 (Sup. Ct. Nassau Co. Sept. 20, 2010) ..................37

Eichler v. Amer. Int'l Grp.,
 No. 05-CV-5167 (FM), 2007 WL 963279 (S.D.N.Y. Mar. 30, 2007)...................45

Ennis v. Sonitrol Mgmt. Corp.,
 No. 02-CV-9070 (TPG), 2006 WL 177173 (S.D.N.Y. Jan. 24, 2006) ..................41

Faison v. Leonard St., LLC,
 No. 08-CV-2192, 2009 WL 636724 (S.D.N.Y. Mar. 9, 2009) ..............................41

Faragher v. City of Boca Raton,
 524 U.S. 775, 118 S. Ct. 2275 (1998) .................................................................45

Farina v. Branford Bd. of Educ.,
 2010 WL 3829160 (2d Cir Nov. 18, 2011)..........................................................38

Feingold v. New York,
 366 F.3d 138 (2d Cir. 2004)...........................................................................35, 36

Fisher v. Vassar College,
 114 F.3d 1332 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998)(abrogated on other
 grounds by Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct.
 2097 (2000))............................................................................................................5

Fletcher v. Atex, Inc.,
 68 F.3d 1451 (2d Cir. 1995)................................................................................33

Francis v. Pactiv Corp., Wambold, Morris, Condon, and Vinopal,
    No. 04-CV-417, 2007 WL 879672 (E.D.N.Y. Mar. 21, 2007)..................................22

Francis v. Runyon,
    928 F. Supp. 195 (E.D.N.Y. 1996) ...............................................................................35

Galabya v. NYC Bd. of Ed.,
    202 F.3d 636 (2d Cir. 2000)...............................................................................10, 12

Garber v. New York City Police Dep't,
    159 F.3d 1346, 1998 WL 514222 (2d Cir. 1998) ........................................................11

Garber v. New York City Police Dept.,
    No. 95 Civ. 2516 (JFK), 1997 WL 525396 (S.D.N.Y. Aug. 22, 1997), aff'd, 159 F.3d
    1346 (2d Cir. 1998)..........................................................................................................15

Gelin v. Geithner,
    No. 06-CV-10176, 2009 WL 804144 (S.D.N.Y. Mar. 26, 2009) aff'd, 09-1759-cv,
    2010 WL 1853925 (2d Cir. May 11, 2010) ................................................................22

Gibbs v. N.Y.S. Dep't of Taxation & Finance,
    No. 04-CV-905 (FB)(LB), 2009 WL 754307 (S.D.N.Y. Mar. 20, 2009)..................14, 16, 33

Gordon v. New York City Bd. of Educ.,
    232 F.3d 111 (2d Cir. 2001)...........................................................................................43

Gorzynski v. Jetblue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010)..............................................................................................7

Gregory v. Daly,
    243 F.3d 687 (2d Cir. 2001)...........................................................................................30

Gross v. FBL Financial Services, Inc.,
    559 U.S. ___, 129 S. Ct. 2343 (2009)............................................................................6

Hargett v. National Westminster Bank, USA,
    78 F.3d 836 (2d Cir. 1996).............................................................................................34

Hill v. Rayboy-Brauestein,
    467 F. Supp. 2d 336 (S.D.N.Y. 2006)...........................................................................16

Holt v. KMI-Continental, Inc.,
    95 F.3d 123 (2d Cir. 1996), cert. denied, 520 U.S. 1228, 117 S. Ct. 1819, 137 L. Ed.
    2d 1027 (1997)................................................................................................................34

Holtz v. Rockefeller Ctr., Inc.,
    258 F.3d 62 (2d Cir. 2001).............................................................................................42

Jackan v. N.Y. State Dep't of Labor,
    205 F.3d 562 (2d Cir. 2000)................................................................19, 28, 29

James v. New York Racing Ass'n,
    233 F.3d 149 (2d Cir. 2000)................................................................6

Jeffreys v. City of New York,
    426 F.3d 549 (2d Cir. 2005)................................................................21, 37

Jimoh v. Ernst & Young,
    908 F. Supp. 220 (S.D.N.Y. 1995) ................................................................34

Joseph v. N. Shore Univ. Hosp.,
    No. 08-CV-3799 (ARL), 2011 WL 573582 (E.D.N.Y. Feb. 15, 2011)................25, 27

Joseph v. Thompson,
    2005 WL 3626778 (E.D.N.Y. March 22, 2005) ................................................................16

Kassner v. 2nd Ave. Delicatessen Inc.,
    496 F.3d 229 (2d Cir. 2007)................................................................36

Lincoln v. Momentum Sys. Ltd.,
    86 F. Supp. 2d 421 (D.N.J. 2000) ................................................................27

Manko v. Deutsche Bank,
    554 F. Supp. 2d 467 (S.D.N.Y. 2008), aff'd, No. 08-CV-2151, 2009 WL 4256070 (2d
    Cir. Dec. 1, 2009)................................................................9

Massie v. Ikon Office Solutions, Inc.,
    381 F. Supp. 2d 91 (N.D.N.Y. 2005) ................................................................17

McBride v. BIC Consumer Prods. Mfg. Co.,
    583 F.3d 92 (2d Cir. 2009)................................................................27

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)................................................................5

McKennon v. Nashville Banner Publishing, Co.,
    513 U.S. 352 (1995)................................................................48, 50

Meiri v. Dacon,
    759 F.2d 989 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985) ................9

Nieves v. District Council 37,
    No. 04 Civ. 8181(RJS), 2009 WL 4281454 (S.D.N.Y. Nov.24, 2009) ................14

Ochei v. Coler/Goldwater Mem'l Hosp.,
    450 F. Supp. 2d 275 (S.D.N.Y. 2006)................................................................36

Patterson v. County of Oneida, N.Y.,
    375 F.3d 206 (2d Cir. 2004).................................................................................4

Petrosino v. Bell Atl.,
    385 F.3d 210 (2d Cir.2004)...............................................................................4, 36

Phillips v. Bowen,
    278 F.3d 103 (2d Cir. 2002)...............................................................................10

Price Waterhouse v. Hopkins,
    490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)(O'Connor, J. concurring)..............21

Quinones v. C.L.B. Check Cashing, Inc.,
    No. 07 Civ. 281(LAP), 2008 WL 5147029 (S.D.N.Y. Oct. 4, 2008) ........................................19

Ragin v. East. Ramapo Cent. Sch. Dist.,
    No. 05-CV-6496 (PGG), 2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010) ................................31

Ragusa v. Malverne Union Free Sch. Dist.,
    2010 WL 2490966 (2d Cir. 2010)........................................................................38

Reeves v. Johnson Controls World Servs.,
    140 F.3d 144 (2d Cir.1998).................................................................................24

Ricks v. Conde Nast Publ'g, Inc.,
    92 F. Supp. 2d 338 (S.D.N.Y. 2000), aff'd, 2001 WL 273835 (2d Cir. 2001)......................34

Ruhling v. Tribune Co.,
    No. 04-CV-2430 (ARL), 2007 WL 28283 (E.D.N.Y. Jan. 3, 2007) ................................43

Ruiz v. County of Rockland,
    609 F.3d 486 (2d Cir 2010)...............................................................................6

Sicular v. NYC Dep't of Homeless Services,
    No. 09 Civ. 0981(AKH)(AJP), 2010 WL 423013 (S.D.N.Y. Feb. 4, 2010) ........................34

Silver v. North Shore Univ. Hosp.,
    490 F.Supp.2d 354 (S.D.N.Y. 2007)....................................................................23

Sims v. City of New York,
    No. 08-CV-5965 (JGK), 2010 WL 3825720 (S.D.N.Y. Sept. 29, 2010) ........................36, 37

Slattery v. Swiss Reinsurance Am. Corp.,
    248 F.3d 87 (2d Cir.), cert. denied, 534 U.S. 951 (2001) ........................................44

Smith v. Reg'l Plan Ass'n,
    No. 10-CV-5857 (BSJ)(KNF), 2011 WL 4801522 (SDNY Oct 7 2011) ................................39

Staff v. Pall Corp.,
    233 F.Supp.2d 516 (S.D.N.Y. 2002)............................................................11

Starr v. Time Warner, Inc.,
    No. 07-CV-5871 (DC), 2007 WL 4144627 (S.D.N.Y. Nov.21, 2007)....................................29

Stoddard v. Eastman Kodak Co.,
    No. 07-1783-cv, 2009 WL 367553 (2d Cir. Feb. 13, 2009) ....................................43

Sutton v. United Airlines, Inc.,
    527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)..........................................40

Szarzynski v. Roche Laboratories, Inc.,
    No. 07-CV-6008, 2010 WL 811445 (W.D.N.Y. Mar. 1, 2010) ............................................17

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir.2003)..................................................................36

Texas Dep't of Community Affairs v. Burdine,
    450 U.S. 248 (1981)..........................................................................5, 6

Thornley v. Penton Publ'g,
    104 F.3d 26 (2d Cir. 1997).....................................................................9

Thornton v. Simpson Thatcher & Bartlett,
    No. 83-CV-8409, 1986 WL 6012 (S.D.N.Y. May 21, 1986) .................................................32

Valentine v. Standard & Poor's,
    50 F. Supp. 2d 262 (S.D.N.Y. 1999)............................................................14

Van Zant v. KLM Royal Dutch Airlines,
    80 F.3d 708 (2d Cir. 1996)......................................................................4

Vermette v. Verizon Wireless,
    No. 09-CV-6085, 2011 WL 3902757 (W.D.N.Y. Sept. 6, 2011) ............................................34

Waters v. General Bd. of Global Ministries,
    769 F.Supp.2d 545 (S.D.N.Y. 2011)............................................................17

Watson v. Arts & Entm't Television Network,
    No. 04-CV-1932, 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008) ............................................26

Weeks v. New York State,
    273 F.3d 76 (2d Cir. 2001)....................................................................16

Weinstock v. Columbia Univ.,
    224 F.3d 33 (2d Cir. 2000)....................................................................33

Weiss v. Hustedt Chevrolet,
    No. 05-CV-4230 (DRH) (MLO), 2009 WL 2132444 (E.D.N.Y. July 13, 2009) ...................40

Williams v. Alliance Nat'l, Inc.,
    No. 98-CV-7984 (RCC), 2001 WL 274107 (S.D.N.Y. Mar. 19, 2001), aff'd, No. 01-
    7350, 2001 WL 1486404 (2d Cir. Nov. 19, 2001)......................................................................9

Woods v. American Stock Exch.,
    No. 95-CV-5646 (JSR), 1997 WL 151453 (S.D.N.Y. Apr. 1, 1997) (Rakoff, J.)..................46

Yarde v. Good Samaritan Hosp.,
    360 F. Supp. 2d 552 (S.D.N.Y. 2005).................................................................................43

**STATUTES**

29 U.S.C. § 621 et. seq.................................................................................................................6

29 U.S.C. § 626(d)(2) ...................................................................................................................4

42 U.S.C. § 2000e-5(e) .............................................................................................................4, 6

42 U.S.C. § 12102(2)(A)..............................................................................................................25

42 U.S.C. § 12111(9)(B)..............................................................................................................28

42 U.S.C. § 12117(a) .....................................................................................................................4

4816-3202-9454, v. 1

Defendant Thomson Reuters ("Defendant") by its undersigned attorneys, Jackson Lewis LLP, submits this memorandum of law in support of its motion for summary judgment dismissing the Complaint of Plaintiff Charles F. McGrath, Jr. ("McGrath" or "Plaintiff"), pursuant to Fed. R. Civ. P. Rule 56.

## PRELIMINARY STATEMENT

This case is about a self-aggrandizing fraud who, despite claiming to be the "best salesman he ever met," did not make a single sale in his last six months of active employment with Defendant, and who thereafter -- during seven months of medical leave -- ignored the interactive process initiated by Defendant to evaluate whether to provide Plaintiff with a reasonable accommodation. Plaintiff never returned to work or responded to Defendant's requests for documentation/information. Accordingly, Defendant's employment was terminated for job abandonment on November 2, 2009.

Plaintiff's Complaint relates to his third and most recent stint of employment with Defendant, from August 2006 through November 2, 2009. For most of this time Plaintiff was a Relationship Manager in Defendant's Business Direct division and responsible for renewing orders of annually-updated hard-copy books known as "Nelson Directories," which Plaintiff conceded mainly sold themselves. In mid-2008, Defendant announced it was discontinuing selling Nelson Directories, and although it could have laid off Plaintiff as it had one of his younger co-workers, Defendant gave Plaintiff another position selling Defendant's software-based product, Thomson ONE Advisor ("T-ONE"). In October 2008, Plaintiff took a leave for his leg/foot condition -- without making any formal requests or submitting necessary paperwork -- that Defendant granted for six weeks. Later, Plaintiff failed miserably at selling T-ONE, did not make any sales and did not meet his sales goals. Thus, in January 2009 Defendant gave him an unsatisfactory performance review for 2008 and in April issued him a Performance

1

Improvement Plan.

In early January 2009, after he received his unsatisfactory review, Plaintiff informed his managers that he would be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Although Plaintiff had did not complain internally before threatening to file the charge, Human Resources encouraged Plaintiff to participate in an investigation and expeditiously and thoroughly investigated his allegations.

The timing of Plaintiff's threatened charge -- at the heels of his performance review -- suggests that Plaintiff was aware that he was not suited for the new position given to him and tried to pre-empt a potential termination. Defendant concluded its investigation and did not find any evidence of discrimination or retaliation. During the investigation with Human Resources, Plaintiff did not allege harassment by his indirect manager Mark Sonders ("Sonders") that is now paramount and the exclusive basis for his hostile work environment claim in this lawsuit. Moreover, Plaintiff did not file an EEOC charge until the end of May 2009, after he started a leave of absence from which he never returned.

Plaintiff last worked April 30, 2009. He simply left work and did not return. In its normal procedure, Defendant sent Plaintiff paperwork to initiate a leave of absence for which he received short term disability benefits and later, after numerous leave extensions, long term disability benefits. Defendant also unilaterally designated Plaintiff's leave as covered by the Family and Medical Leave Act ("FMLA"). When Plaintiff exhausted his FMLA leave, Defendant sent him letters to ask him to provide documentation and information to consider providing him an extended leave of absence as a reasonable accommodation (referred to as the "interactive process"). Plaintiff disregarded Defendant's correspondence, which he considered to be "clutter," and left voicemail messages for Human Resource representatives stating his

reluctance to provide information and to respond. After several more months, and following requests in writing that Plaintiff return to work to no avail, Defendant informed him in writing that his employment would be terminated for job abandonment. Plaintiff's handwriting appears on the envelopes for such letters rejecting receipt of the letters despite his claims that he never received any letters from Defendant.

Plaintiff's claims of age, religion and disability discrimination, hostile work environment and retaliation fail as a matter of law. Several of Plaintiff's claims -- related to an alleged demotion in 2007 and a statement about religion in 2007 -- are time barred. Plaintiff's claims that are not time-barred (as well as those that are time-barred) fail as a matter of law as follows:

1. Plaintiff cannot prove he was qualified for the position from which he was administratively terminated, he did not suffer an adverse employment action by Defendant and, with regard to his age and religion claims, there is no inference of discrimination;

2. Plaintiff is not "disabled" within the meaning of the Americans With Disabilities Act because he was incapable of working after April 30, 2009, based on his own admission, his physician's statements and a determination by the Social Security Administration, which determination also judicially estops Plaintiff from claiming disability discrimination;

3. Defendant accommodated Plaintiff despite his failure to engage in the interactive process to provide Plaintiff a leave of absence following the expiration of his FMLA leave;

4. Defendant has articulated legitimate business reasons for the alleged adverse employment actions, and Plaintiff cannot show that defendant's proffered reasons are a pretext for discrimination;

5. Plaintiff cannot show that he was subjected to a hostile work environment based on age, religion or disability;

6. Plaintiff cannot show that his PIP or administrative termination for job abandonment was retaliatory;

7. Defendant exercised reasonable care to prevent and to promptly correct discrimination, harassment and retaliation about which Plaintiff never made a complaint; and

3

8. Plaintiff's fraudulent omissions and misrepresentation in his resume and employment application with Defendant bar any recovery following October 4, 2011 based on the after-acquired evidence doctrine.

In sum, Defendant is entitled to summary judgment on all of Plaintiff's claims.

## FACTS

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56 and Local Civil Rule 56.1 of this Court, the undisputed material facts relevant to this motion are set forth in separately numbered paragraphs in the accompanying Statement of Undisputed Material Facts in Support of Defendant's Motion For Summary Judgment ("SUMF") which are incorporated herein by reference.

## ARGUMENT

**POINT I:    PLAINTIFF'S CLAIMS WHICH AROSE PRIOR TO AUGUST 14, 2008 ARE UNTIMELY.**

Several alleged adverse employment actions concerning claims under Title VII, the ADEA and the ADA described in Plaintiff's Complaint are time-barred because they occurred more than 300 days before Plaintiff filed his United States Equal Employment Opportunity Commission ("EEOC") Charge on June 9, 2009. See 42 U.S.C. § 2000e-5(e)(Title VII); 29 U.S.C. § 626(d)(2)(ADEA); 42 U.S.C. § 12117(a)(ADA); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996). Plaintiff was required to file a discrimination charge with the EEOC within 300 days of the alleged discrimination, harassment or retaliation to assert timely claims under Title VII, ADEA and ADA. When a plaintiff's allegations of discrimination extend beyond the 300–day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct. Petrosino v. Bell Atl., 385 F.3d 210, 220 (2d Cir.2004). A plaintiff cannot recover for distinct acts of discrimination, such as termination and demotion, occurring outside the 300 day statutory time period. Patterson v. County of Oneida,

N.Y., 375 F.3d 206, 220 (2d Cir. 2004) (Title VII claims).

Here, Plaintiff cannot recover for discrete acts of discrimination, harassment or retaliation alleged in Plaintiff's Complaint that transpired prior to the "magic date" of August 14, 2008, which is 300 days from the filing date of June 9, 2009 on his EEOC charge. (Boyarsky Aff. Ex. B). However, in Plaintiff's EEOC Charge and Complaint, he alleged that in 2007 he was demoted and that in 2007 a non-supervisory, co-worker Iris Ramos called him an "Atheist." (Pl. Dep. pp. 137, 175-176, 219). Both alleged incidents/events occurred prior to August 14, 2008 and, therefore, are untimely. Accordingly, claims related to the alleged demotion and the "Atheist comment" -- which constitutes Plaintiff's entire religious discrimination claim -- should be dismissed as a matter of law.

**POINT II:** **PLAINTIFF'S CLAIMS OF DISCRIMINATION BASED ON AGE, RELIGION AND DISABILITY SHOULD BE DISMISSED AS A MATTER OF LAW.**

A plaintiff alleging employment discrimination may use direct evidence to prove his case. Where, as here, there is no direct evidence of discrimination, courts in the Second Circuit apply the McDonnell Douglas/Burdine burden-shifting analysis to determine the ultimate issue of intentional discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Under this framework, the employee bears the initial burden of establishing a *prima facie* case of discrimination. See, e.g., Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998)(abrogated on other grounds by Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097 (2000)). If the employee establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory, non-retaliatory reason for the employment decision. McDonnell Douglas Corp., 411 U.S. at 802; Burdine, 450 U.S. at 256. If the employer satisfies its burden of production, the

5

burden of proof then shifts back to the employee to prove the proffered reasons are a pretext to mask discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

This determination is made on a "case by case" approach evaluating "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000)(citation omitted).

### A.   **Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on Age, Religion or Disability**.

#### 1.   **Plaintiff's Age and Religious Discrimination Claims**.

Plaintiff alleges age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, and religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(e). (Boyarsky Aff. Ex. B). With regard to his age and religious discrimination claims, Plaintiff cannot establish a *prima facie* case.

To establish a *prima facie* case of discrimination based on age or religion, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir 2010); Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002).

Under the ADEA, Plaintiff also must prove that his age was the *sole,* "but for" reason for his dismissal. Gross v. FBL Financial Services, Inc., 559 U.S. ___, 129 S. Ct. 2343 (2009).

6

Consequently, Plaintiff must show that his age was the determining factor and that, but for the employer's discriminatory motive, the adverse employment action would not have taken place. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106-07 (2d Cir. 2010).

### a. Plaintiff Did Not Perform His Duties in a Satisfactory Manner Prior to His Separation.

Plaintiff, who was over 40 years old at the time he was re-hired for the second time in 2006, is a member of the class of individuals protected by the ADEA. (Pl. Dep. p. 13). However, Plaintiff did not perform his job duties in a satisfactory manner beginning in September 2008 through the last day Plaintiff worked, i.e., April 30, 2009 and, thus, fails the second prong of this test.

In or around mid-2008, Defendant decided to discontinue selling the Nelson Directories, a product sold to Defendant's existing customers, and the only product that Plaintiff sold. (Sharma Aff. ¶ 31).  Rather than terminating Plaintiff's employment when it eliminated the Nelson Directories,[1] Sonders, the executive in charge of Business Direct, reassigned Plaintiff to sell another of Defendant's products called T-ONE in a Sales Specialist role. (Pl. Dep. pp. 176-177, 550, 600-602; Sharma Aff. ¶ 32).  Plaintiff received formal training and informal training on the use of T-ONE.  (Pl. Dep. pp. 156, 222-223, 232-238).[2]

Despite Plaintiff's self-characterization as "the best salesman he ever met," he did not make a single sale of T-ONE between September 2008 and October 9, 2008 when Plaintiff took a six-week medical leave of absence that Defendant unilaterally designated as Family and Medical Leave Act ("FMLA") leave despite Plaintiff's failure to request leave. (Pl. Dep. pp.

---

[1] Defendant terminated the employment of Judy Schneider, an employee under the age of 40 who worked with Plaintiff selling Nelson Directories, when it discontinued Nelson Directories. (Pl. Dep. pp. 180-181).  The fact that Defendant did not terminate Plaintiff simultaneously but rather found him another job undermines any age discrimination claim.

[2] The Sales Specialist role is a higher level role position than Plaintiff's previous Relationship Manager role.  It involves direct sales and the ability to earn sales commissions, i.e., potentially higher compensation.

109-111, 210, 246, 399; Boyarsky Aff. Ex. L).  Plaintiff returned from his approved FMLA leave on or about November 17, 2008, and received credit for only one T-ONE sale by December 31, 2008.[3]  (Pl. Dep. pp. 210, 595).  Based on his performance with T-ONE, he was given an unsatisfactory annual evaluation for 2008.  (Boyarsky Aff. Ex. P; Sharma Aff. ¶¶ 41, 42). Sharma and Sara McCabe ("McCabe"), one of Defendant's Human Resource representatives, met with Plaintiff to discuss his performance review.  In the meeting, Plaintiff admitted that his current position was not appropriate for him. (Sharma Aff. ¶ 43).  Similarly, Plaintiff testified in his deposition that the Sales Specialist position was not a good fit for him.  (Pl. Dep. pp. 641-642; Sharma Aff. ¶ 43).

Plaintiff did not make a single sale of T-ONE between January 2009 and the end of April 2009.  (Pl. Dep. pp. 109-111).  Plaintiff's monthly sales goal was only two thousand five hundred dollars ($2,500.00), but he never achieved the goal.  (Boyarsky Aff. Ex. U).  Because Plaintiff significantly underperformed selling T-ONE in 2008, Sonders asked Plaintiff to complete a Territory Development Plan ("TDP")[4] to assist Plaintiff identify his sales objectives and plans to achieve them.  (Pl. Dep. p. 634; Boyarsky Aff. Ex. R).  Plaintiff refused to complete the TDP.[5]  (Pl. Dep. p. 634).  In the ensuing months, Plaintiff's performance did not improve. (Sharma Aff. ¶ 46).  During this time, Plaintiff's manager, Dave Sharma ("Sharma"), offered to help Plaintiff with his call scripts and strategies for making sales. (Sharma Aff. ¶ 44).  Plaintiff admitted, contrary to his Complaint, that he welcomed Sharma's assistance and further testified that Sharma's call scripts were better than his own.  (Pl. Dep. pp. 242-243).  Plaintiff's co-

---

[3] To disprove Plaintiff's allegation that his list of prospective T-ONE customers was "junk" as Plaintiff referred to it, Sonders called a prospective customer from the list with Plaintiff and immediately made the sale.  Plaintiff was given credit for this sale.  However, he never made a single sale.  (Sharma Aff. ¶ 47).
[4] The TDP was not a Performance Improvement Plan ("PIP").  (Boyarsky Aff. Ex. R).
[5] Defendant provided approximately a dozen other Business Direct employees with a TDP due to underperformance, and similarly asked them to complete the TDP.  Unlike Plaintiff, these employees submitted a completed TDP.  (Pl. Dep. p. 636; Boyarsky Aff. Ex. T).

workers, Alfredo Sanchez Montenegro ("Sanchez") and Iris Ramos ("Ramos"), also provided assistance to him such as to log on to an application enabling him to conduct online demonstrations. (Pl. Dep. pp. 37-38, 235-237). Nonetheless, Plaintiff continued to struggle in his sales efforts.

### b.    Plaintiff Received a PIP in April 2009.

Performance evaluations have been given weight by courts in determining whether an employee's job performance was satisfactory. See Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985) (courts may rely on evaluations prepared by the employee's supervisors); Thornley v. Penton Publ'g, 104 F.3d 26, 29 (2d Cir. 1997) (a court must look to "the employer's criteria for the performance of the job"); Manko v. Deutsche Bank, 554 F. Supp. 2d 467, 478 (S.D.N.Y. 2008)(plaintiff's continued failure to conform to the performance standards issued by her supervisors indicated a lack of qualification for the position for which she was hired), aff'd, No. 08-CV-2151, 2009 WL 4256070 (2d Cir. Dec. 1, 2009); Williams v. Alliance Nat'l, Inc., No. 98-CV-7984 (RCC), 2001 WL 274107 at *16 (S.D.N.Y. Mar. 19, 2001) (second prong of *prima facie* case not satisfied when employee receives warnings regarding performance and fails to conform), aff'd, No. 01-7350, 2001 WL 1486404 (2d Cir. Nov. 19, 2001).

Plaintiff's unsatisfactory performance in the latter part of 2008 continued into 2009. Sharma -- who Plaintiff admitted sincerely tried to help him and did not discriminate against or harass him -- attempted to assist Plaintiff by offering sales scripts and coaching him. (Pl. Dep. pp. 242-243, 277-280, 960, 1013; Sharma Aff. ¶ 44). After months of training and coaching

Plaintiff to no avail, Defendant gave Plaintiff a PIP.[6]  (Sharma Aff. ¶ 51; Boyarsky Aff. Ex. Y).

Plaintiff's non-existent sales buttressed by his admission that the Sales Specialist position was

not a good fit for him clearly establishes that Plaintiff was not satisfactorily performing his job

duties and, thus, was not qualified for his position.  Therefore, with regard to his termination

claim, he cannot satisfy the second prong of the *prima facie* case.

<strong>c.   Plaintiff Did Not Suffer Any Adverse Employment Action.</strong>

Plaintiff cannot establish that he suffered an adverse employment action, the third prong

of the *prima facie* case.  An adverse employment action is a materially adverse change in the

terms and conditions of employment.  Galabya v. NYC Bd. of Ed., 202 F.3d 636, 640 (2d Cir.

2000)(abrogated on other grounds).  Examples of materially adverse actions include "a termination

of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title,

a material loss of benefits, [or] significantly diminished material responsibilities."  De La Cruz v.

City of New York, 783 F. Supp. 2d 622, 638 (S.D.N.Y. 2011); Collins, 305 F.3d at 118.  An

adverse employment action is one which is "more disruptive than a mere inconvenience or an

alteration of job responsibilities."  Galabya, 202 F.3d at 640 (quoting Crady v. Liberty Nat'l

Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).  Simply because an employee is unhappy

about an action does not mean it is a materially adverse employment action.  Phillips v. Bowen,

278 F.3d 103, 117 (2d Cir. 2002).

Plaintiff has not presented evidence of any action that could be considered "materially

adverse."  Plaintiff's allegations in this regard consist of: (a) an alleged "demotion" in early

2007; (b) reassigning his responsibility for Nelson Directories book sales to two co-workers

while he was on leave in October 2008; (c) a negative 2008 performance review; (d) repeated

---

[6] The PIP focused on achieving sales goals through the use of TRUST to track opportunities and to generate leads as well.  The PIP also discussed increasing client interactions.  The PIP provides 60 days to improve performance and states the potential consequences of continued poor performance.  (Boyarsky Aff. Ex. Y).

coaching by Sharma in 2009 after Plaintiff did not make any sales; (e) the April 2009 PIP; and (f) the cessation of his employment in November 2009.  None of these alleged actions constitute an adverse employment action.

### i.        Alleged Demotion.

Assuming *arguendo* the alleged "demotion" in early 2007 is not time barred, which it is (see Point One *supra*), Plaintiff cannot establish that he was actually demoted.  Thus, the actions surrounding the alleged "demotion" do not constitute an adverse employment action.

Plaintiff alleges that he was "demoted to a secretarial position" when he was transferred out of Business Direct and into Bill Moore's group in Thomson Financial.  (Pl. Dep. pp. 137, 167).  Yet, Plaintiff's subjective feelings that he was demoted are not sufficient to create a genuine issue of material fact as to a demotion.  See, e.g., Garber v. New York City Police Dep't, 159 F.3d 1346, 1998 WL 514222, at *4 (2d Cir. 1998) (lateral transfer was not a demotion despite plaintiff's subjective feelings and emotions, where plaintiff conceded that his change in position did not threaten his salary or benefits).

Additionally, a change in title is not dispositive of whether an employee was "demoted." See Staff v. Pall Corp., 233 F.Supp.2d 516, 533 (S.D.N.Y. 2002)(no adverse employment action occurred without evidence other than plaintiff's own conclusory opinion that a change in title following a transfer was a demotion where his prior and subsequent departments were organized differently and the prior and subsequent job titles were distinct in name only).  Plaintiff admitted that he did not suffer a loss of salary or benefits as a result of this transfer.  (Pl. Dep. pp. 200-202).  Further, Plaintiff did not provide evidence of a change in his responsibilities other than stating in a conclusory manner that he was assigned secretarial duties.  Finally, Plaintiff admitted that no manager told him that he was being "demoted."  (Pl. Dep. p. 201).

Plaintiff's title only changed from Senior Relationship Manager to Relationship Manager

11

because the title Senior Relationship Manager was different in Bill Moore's group from that which Plaintiff held in Business Direct; in Moore's group, a "Senior Relationship Manager" was equivalent to a "Sales Specialist" in Business Direct, who had different responsibilities than Plaintiff and was compensated differently. (Moore Aff. ¶ 5). Bobby Hart ("Hart") was the Senior Relationship Manager in Moore's group. (Moore Aff. ¶ 8). Moreover, Plaintiff did not provide any examples of tasks assigned to him that were secretarial in nature, simply stating that it was a "clerical" position to "clean up" Hart's "messes." (Pl. Dep. p. 202). Nonetheless, it is well settled that a mere alteration of job responsibility alone is insufficient to establish a materially adverse employment action. Galabya, 202 F.3d at 640 (abrogated on other grounds).

Additionally, Plaintiff's role did not change when he was placed in Moore's group -- he remained responsible for selling Defendant's products to Defendant's academic clients, his salary remained the same, the bonus potential remain unchanged and he was not held accountable for generating sales revenue – the same as in Business Direct.[7] (Moore Aff. ¶¶ 6, 7).

When deposed, Plaintiff admitted several times that he did not consider the "demotion" to be discriminatory. (Pl. Dep. pp. 202, 556, 805). Rather, Plaintiff testified that he felt it was simply a poor business decision to give Hart the Senior Relationship Manager position over him because -- in his opinion -- he was a superior salesman to Hart who had been employed with Defendant for twenty years in sales.[8] (Pl. Dep. pp. 556-557). In sum, Plaintiff cannot show that he suffered an adverse employment action merely by pointing to his subjective, personal disappointment with his new position. See, e.g, Beyer v. County of Nassau, 524 F.3d 160, 164

---

[7] Plaintiff actually was given *additional* products to sell, which belies Plaintiff's allegation that he was demoted. (Moore Aff. ¶ 6).
[8] Plaintiff testified -- and for the first time in this litigation alleged -- that Hart was "promoted" over him because Hart is African American. To the extent he claims reverse race discrimination through his deposition testimony, this claim is new, time-barred and should be dismissed because it is absent from the EEOC Charge and his Court Complaint. Additionally, Hart was not "promoted," but rather was already a Senior Relationship Manager in Moore's group at the time of Plaintiff's transfer. (Pl. Dep. pp. 807-808, 817-819; Moore Aff. ¶¶ 4, 8).

(2d Cir. 2008)(quotation omitted).

          ii.      **Reassignment of Clients While Plaintiff Was On Six Weeks of Medical Leave.**

Plaintiff alleges that in or around September 2008 Defendant reassigned a portion of "his book of business," i.e., the list provided by Defendant of existing Nelson Directories clients, to Ramos and Suzanna Lim ("Lim"), who also sold the CD form of Nelson Directories. (Pl. Dep. pp. 176-177, 545-545, 549, 645). Plaintiff -- without offering evidence to show discriminatory intent -- simply testified that selling to another employee's client list and taking the commissions when that employee is on leave is just "not done in a sales organization" because you "don't steal from other salespeople."[9] (Pl. Dep. pp. 826-827). Plaintiff's claim is based on "common courtesy" and "tradition," not a company policy. (Pl. Dep. pp. 254-257).

However, Plaintiff's allegation, which is based on his theory of good business practice, disregards Defendant's business rationale of delivering good service to its clients by having Plaintiff's co-workers help cover his accounts while he was on leave. Also, to the extent Plaintiff claims Lim and Ramos improperly continued to handle some of his accounts after he returned from leave, Defendant had already assigned him to sell T-ONE prior to his leave, which afforded him a job after Defendant discontinued the Nelson Directories. (Pl. Dep. pp. 550, 600-602; Sharma Aff. ¶¶ 32, 35). Thus, the reassignment while Plaintiff was on leave -- and to the extent it continued after Plaintiff's return from leave -- did not materially affect Plaintiff's employment and accordingly does constitute an "adverse employment action." See, e.g., Adams v. Northstar Location Servs., 2010 WL 3911415 at *8 n.2 (W.D.N.Y. October 4, 2010).

---

[9] It should be noted that while Plaintiff took umbrage with the temporary reassignment of the Nelson Directories business while he was on leave, Plaintiff did *not* receive commissions for selling Nelson Directories but rather would receive a bonus if he hit a sales target. Plaintiff continued to handle the remaining hard-copy Nelson Directories sales through the end of 2008. (Sharma Aff. ¶ 40).

Plaintiff's allegation of a discriminatory reassignment while he was on leave is belied by the fact that while Lim took maternity leave, Defendant reassigned her clients to her co-workers to ensure they were adequately covered in her absence.  The co-workers who handled Lim's accounts, not Lim,  received credit for the sales they made to Lim's accounts during her leave. (Sharma Aff. ¶ 38).

### iii.      Unsatisfactory Performance Evaluation.

Plaintiff apparently claims his 2008 performance review constitutes an adverse employment action.  Yet, a negative performance evaluation can only constitute an adverse employment action if there are accompanying adverse consequences affecting the employee's terms of employment.  Gibbs v. N.Y.S. Dep't of Taxation & Finance, No. 04-CV-905 (FB)(LB), 2009 WL 754307 at *6 (S.D.N.Y. Mar. 20, 2009)(a negative evaluation can only constitute an adverse employment action where it leads to tangible employment consequences, such as a loss in pay); Nieves v. District Council 37, No. 04 Civ. 8181(RJS), 2009 WL 4281454 at *8 (S.D.N.Y. Nov.24, 2009)("Cases within the Second Circuit . . . have held that performance warnings, without more, do not constitute a materially adverse action.").  See also Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999)(negative evaluations alone without any accompanying adverse result are not cognizable as material adverse employment actions).

Plaintiff cannot show that his unsatisfactory 2008 performance review caused a materially adverse change in the conditions of his employment.  The review did not have any resulting negative consequences, such as demotion, suspension, loss of wages or any action which marked him as a lesser employee.  As such, the unsatisfactory 2008 performance review can in no way constitute an "adverse employment action."

Plaintiff's claim that his 2008 performance review was prepared improperly because it did not factor in his six-week leave is contradicted by the 2008 review, which specifically refers

to his leave of absence:

> Even though Charles has been provided 2 calling lists (Cambridge and H Beck), according to Trust, his daily average completed activity level over the past 6 months (assuming 20 business per month – <u>23 days LOA</u>) was 9 per day.

(Emphasis added).  (Boyarsky Aff. Ex. Y).  Plaintiff was expected to make at least 25-40 calls per day.  (Sharma Aff. ¶ 11).  The acronym "LOA" stands for leave of absence, which Defendant considered to calculate the number of entries he made in the customer relationship management database called "TRUST" Defendant used to track sales activity.  (Sharma Aff. ¶ 13).

Plaintiff also claims the 2008 performance review was improper because it did not take into account the six-month period during which he successfully sold Nelson Directories while reporting to Chris Capuana ("Capuana").  (Pl. Dep. pp. 618-619).   However, Sharma, not Capuana, prepared the 2008 performance review.  (Boyarsky Aff. Ex. P).  Defendant weighted Plaintiff's evaluation toward the sales of the product he would continue to sell, <u>i.e.</u>, T-ONE, because the more relevant time period concerned his more recent sales efforts.  (Sharma Aff. ¶ 42).  Moreover, Plaintiff admitted that he did not request Capuana to evaluate his performance at any time, a request Defendant never denied.  (Pl. Dep. p. 702).

Plaintiff's subjective perception that his evaluation should have included input from Capuana is insufficient to establish that the 2008 performance review was in any way an improper adverse employment action.  <u>See</u>, <u>e.g.</u>, <u>Garber v. New York City Police Dept.</u>, No. 95 Civ. 2516 (JFK), 1997 WL 525396 at *6 (S.D.N.Y. Aug. 22, 1997)(plaintiff's purely subjective feelings did not negatively alter terms and conditions of employment).   Similarly, it is not a court's role to act as a "super personnel department" that second-guesses a defendant's business judgment.  <u>Byrnie v. Town of Cromwell Bd. of Educ.</u>, 243 F.3d 93, 103 (2d Cir. 2001).  Even if the absence of comments from Capuana was bad judgment, its omission alone is not actionable

and should not be second-guessed by the Court.

**iv.      Coaching and Counseling by Sharma.**

To the extent that Plaintiff claims Sharma's coaching, counseling and mandatory product demonstrations of T-ONE are "adverse employment actions," Plaintiff's claim fails.   Close scrutiny does not constitute an adverse employment action.  Joseph v. Thompson, 2005 WL 3626778 at *9 (E.D.N.Y. March 22, 2005).  Furthermore, Plaintiff's claim of being singled out and subjected to rude treatment from Sonders[10] likewise does not constitute an adverse employment action as a matter of law.  See Gibbs, 2009 WL 754307 at *6 (yelling and unfair criticism do not rise to the level of adverse employment actions); Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001)(criticism of an employee is not an adverse employment action)(abrogated on other grounds); Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006)("micro-management" and "excessive scrutiny" were not adverse employment actions, particularly where plaintiff's only evidence presented was "her own perception that she was treated differently").

In contrast, Plaintiff testified that Sharma sincerely tried to help him and that he valued Sharma's assistance.  (Pl. Dep. pp. 242-243).  Plaintiff admitted that his sales performance in 2009 was abysmal and even conceded that Defendant would have had a legitimate basis to terminate his employment for poor performance, a result he accused Defendant of purposely avoiding to insulate the Company from a discrimination claim.  (Pl. Dep. pp. 596-598).

---

[10] Plaintiff alleges that Sonders called him "old man," said his "leg would fall off" and that "he has gangrene." Plaintiff completely contradicted himself several times when asked in his deposition for the time period Sonders made such comments. (Pl. Dep. pp. 214, 420-421, 542-543, 773-774).  It appears these alleged comments stopped in or about January 2009, four months prior to Plaintiff's last day of active employment, because Sonders stopped communicating with Plaintiff. (Pl. Dep. pp. 542-543).  Such alleged cessation of communications is not an adverse employment action. See, e.g. Carpenter v. City of Torrington, No. 03-9194, 2004 WL 1292756 (2d Cir. June 10, 2004)(citation omitted)).   Accordingly, during the time Plaintiff's performance was worst, it does not appear Sonders made any such statements to Plaintiff.  Plaintiff also states that Sonders singled him out and was a "bully" but does not provide any detail regarding that allegation. (Pl. Dep. p. 822).

Nonetheless, given the nature of, and reason for, Sharma's interaction with Plaintiff, Sharma's coaching, counseling and requirement to perform mock demonstrations[11] does not constitute an adverse employment action.

**v.**      **April 2009 Performance Improvement Plan.**

Plaintiff did not make a single sale over a four-month period in 2009.  (Pl. Dep. pp. 109-111).  Therefore, on or about April 13, 2009 Defendant issued Plaintiff a PIP.  (Boyarsky Aff. Ex. Y).  It is well settled that a PIP is not an adverse employment action.  See, e.g, Waters v. General Bd. of Global Ministries, 769 F.Supp.2d 545, 558 (S.D.N.Y. 2011)(the issuance of a PIP and the recommendation that the plaintiff attend EAP counseling sessions do not constitute adverse employment actions); Szarzynski v. Roche Laboratories, Inc., No. 07-CV-6008, 2010 WL 811445 at *7 (W.D.N.Y. Mar. 1, 2010)(giving plaintiff a PIP to improve his performance and avoid his termination is not an adverse employment action).   Regardless, Defendant appropriately issued Plaintiff a PIP because he did not make any sales.[12]  In sum, the PIP did not constitute an adverse employment action.

**vi.**      **Plaintiff's Termination.**

Plaintiff is no longer employed by Defendant because he refused to communicate with Defendant when it attempted to engage in the interactive process with him to evaluate whether an extension of his leave was a reasonable accommodation for his alleged disability.  (Boyarsky Aff. Exs. SS, TT).  Plaintiff was separated on or about November 5, 2009, after he was on leave

---

[11] Plaintiff testified that other sales employees also were required to perform mock presentations for Sonders.  Such similar treatment undermines a claim of disparate treatment.  (Pl. Dep. pp. 238-241).

[12] Were Plaintiff to claim the PIP is a prelude to termination, fear of termination is not an adverse employment action. See, e.g., Massie v. Ikon Office Solutions, Inc., 381 F. Supp. 2d 91, 99 (N.D.N.Y. 2005)(fear of being terminated is not an adverse employment action because of its lack of consequence).  Finally, to the extent Plaintiff were to claim that the PIP constituted a threat of disciplinary action, it would be insufficient to establish that the PIP was an adverse employment action. Carter v. New York City Dep't of Corr., No. 00-CV-7118, 2001 WL 345170 at *3 (2nd Cir. Apr.5, 2001)("because none of the [discussed] disciplinary actions were actually adjudicated or resulted in punishment against [the plaintiff], he is unable to show that he suffered an adverse employment action").

for over seven months and failed to provide medical documentation requested by Defendant to assess his need for leave.  Plaintiff's voluntary or -- at the very least -- negligent abandonment of his job cannot be construed as an adverse employment action.

Despite numerous letters[13] Defendant sent to Plaintiff requiring Plaintiff to provide Defendant, and not its third party benefit administrators (Hewitt and The Hartford), with documentation to support his need for additional leave after he exhausted FMLA leave, Plaintiff never provided the required documentation.  Plaintiff testified that he ignored these letters, which he considered to be "junk mail" and "clutter." (Pl. Dep. pp. 451-455, 463-464, 923).

After extending Plaintiff's leave of absence for *five months* without any requested documentation from Plaintiff or his physician, Defendant sent Plaintiff a letter dated October 29, 2009 which stated that Defendant would consider Plaintiff to have abandoned his job if he did not contact Defendant by October 30, 2009 to discuss whether he was able to return to work on November 2, 2009.  Plaintiff incredulously testified that he did not read correspondence from Defendant that he received and, thus, Plaintiff did not contact Defendant by October 30, 2009 or provide any documentation by November 2, 2009.[14]  (Pl. Dep. p. 451, 746).  Defendant gave Plaintiff an *additional* three-day grace period, and took no action until November 5, 2009, at which time Defendant terminated Plaintiff's employment.  (Boyarsky Aff. Ex. TT).

Plaintiff made no effort to communicate with Defendant or to return to work.  (Pl. Dep. p. 545).  In this regard, Plaintiff's only communications were two voicemail messages he left for Gregg Aprahamian ("Aprahamian"); on July 17 Plaintiff stated that he needed more time to find

---

[13] Plaintiff disregarded letters from Defendant sent in an attempt to accommodate him dated June 18, 2009, June 25, July 2, 2009, July 21, 2009, July 31, 2009, August 26, 2009, and October 29, 2009. ( Pl. Dep. p. 920; Boyarsky Aff. Exs. MM, OO-SS).

[14] With regard to the October 29 and November 5 letters, Plaintiff testified that he did not recall receiving them, but he admitted the handwriting on the envelopes stating "undeliverable -- return to sender" appears to be his.  Not only did Plaintiff fail to read the letters, he consciously ignored them.  (Pl. Dep. pp. 483, 486; Boyarsky Aff. Exs. SS, TT).

a new doctor, and on July 29 Plaintiff stated his health and doctors are not on "deadlines" and that the timeframe is not decided by Defendant but by the medical profession. (Aprahamian Aff. ¶¶ 9, 11; Boyarsky Aff. Exs. QQ, HHH). Plaintiff either disregarded or intentionally refused to engage in the interactive process Defendant initiated to consider providing him a reasonable accommodation. The obligation to engage in the interactive process is equally applicable to the employee as it is to the employer. See Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000).

No reasonable trier of fact could conclude from the record that Plaintiff was wrongfully discharged from Defendant's employment. Plaintiff's actions or inaction of voluntarily (or negligently) abandoning his position was the sole reason for his separation and, therefore, cannot constitute an adverse employment action. See, e.g., Quinones v. C.L.B. Check Cashing, Inc., No. 07 Civ. 281(LAP), 2008 WL 5147029, at *5 (S.D.N.Y. Oct. 4, 2008) (plaintiff did not suffer an adverse employment action where plaintiff abandoned her job by failing to complete paperwork required for her to return to work).

        d.    **No Alleged Adverse Employment Action Occurred Under Circumstances Giving Rise to an Inference of Discrimination Based on Age or Religion.**

Even assuming, *arguendo*, that Plaintiff could establish the second and third prongs of his *prima facie* case -- which he cannot -- Plaintiff cannot show the requisite inference of discrimination based on his age or religion required under the McDonnell Douglas/Burdine analysis.

        i.    **No Inference of Discrimination Exists Based on Age.**

Contrary to the allegations in the Complaint, Plaintiff testified at his deposition that the *only* person he believes discriminated against him was Sonders. (Pl. Dep. pp. 517, 596). Plaintiff's sole allegation to support his age claim is that Sonders allegedly called Plaintiff "old

man." (Pl. Dep. pp. 213-215).   Plaintiff testified that he and Sonders had an excellent relationship for a significant period of time, during which they traded anecdotes about their childhood sports accomplishments and Sonders called him "old man" in a friendly, nondiscriminatory manner. (Pl. Dep. pp. 390-391, 393).   Plaintiff admitted that he did not have any problem with Sonders calling him an "old man" for quite some time. (Pl. Dep. p. 771). Also, in several significant instances, Sonders came to Plaintiff's defense and/or assistance which Plaintiff recognized.[15]

Plaintiff testified that Sonders' demeanor when calling him "old man" suddenly changed, and he became malicious and nasty. (Pl. Dep. pp. 773-774).   Plaintiff offered no corroborating evidence or details of such alleged instances other than his own conclusory statements.   Plaintiff cannot create a genuine issue of material fact as to whether Sonders allegedly developed an aversion to him based upon his age. See e.g., Coleman v. Prudential Relocation, 975 F.Supp. 234, 241 (W.D.N.Y.1997)(although plaintiff's membership in the age-protected class at the time of her hire does not defeat an ADEA claim, "it certainly strains credulity to think that [the employer] „suddenly developed an aversion to older people' within a year after hiring plaintiff"). See also Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir.1999) (the plaintiff must offer "concrete particulars").

Plaintiff's self-contradicted testimony regarding the timing and frequency of the alleged "old man" comments further erodes any such inference of discrimination.   On different occasions, Plaintiff testified that Sonders made the comment: (a) tens of times; (b) all the time; and (c) incessantly. (Pl. Dep. p. 214, 772-774).   However, Plaintiff immediately admitted that

---

[15] When co-worker Eugene Yhim offended Plaintiff in 2007, Plaintiff spoke to Sonders who encouraged Plaintiff to complain and offered to accompany Plaintiff to Human Resources.   Likewise, when Plaintiff complained to Sonders that he disliked his reassignment to Moore's group, Sonders "went to bat" for him and within weeks had transferred Plaintiff back to Business Direct despite not having an available "team" on which to place Plaintiff.   (Pl. Dep. pp. 144-146, 174).

Sonders did not make the alleged comments "all the time," confessing that "all the time" was an exaggeration. (Pl. Dep. p. 214). Similarly, he testified that the comments started: (a) upon his hire; (b) after 2007 and throughout the remainder of his employment; (c) beginning in March or April 2008; and (d) until January 2009 -- when questioned about his prior inconsistent statements. (Pl. Dep. pp. 214, 421, 542-543, 772).

Although generally a district court may not assess a witness's credibility at the summary judgment stage, the Second Circuit has recognized an exception when a plaintiff relies almost exclusively on his own testimony. See Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005). When a plaintiff relies almost exclusively on his own testimony, the district court may dismiss the case if no reasonable jury would credit plaintiff's testimony. Id. (affirming summary judgment in non-employment case where the only evidence was plaintiff's testimony, which "was ˌso replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint") (citations omitted).

Even if Plaintiff's claims regarding the "old man" comments could be believed, the alleged comments are not tied to any employment action. In fact, Plaintiff testified that Sonders ceased speaking to him in January 2009, after which he received the PIP, Sharma coached/counseled him and his separation of employment took place. (Pl. Dep. pp. 248-249, 542-543). Moreover, there is no evidence that Sonders participated in the decision to separate Plaintiff. Sonders' alleged remarks were unrelated to any decisional process and, thus, insufficient to establish discriminatory intent. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)(O'Connor, J. concurring)("statements made by decisionmakers unrelated to the decisional process itself" are insufficient to establish

discriminatory intent).

Plaintiff similarly cannot prove that any of the cited "adverse employment actions" were motivated by age bias simply because he "thinks" they were. For example, Plaintiff testified that the reason Ramos and Lim were assigned his accounts were based on his age, yet he does offer any evidence that his age played a role in the decision, and further testified he has no evidence that Defendant restructured the Nelson Directories business because of his age. (Pl. Dep. pp. 547-548). Personal speculation that an incident is motivated by age bias, with no objective proof, cannot support an inference of discrimination. See Gelin v. Geithner, No. 06-CV-10176, 2009 WL 804144 at *16 (S.D.N.Y. Mar. 26, 2009) aff'd, 09-1759-cv, 2010 WL 1853925 (2d Cir. May 11, 2010); Francis v. Pactiv Corp., Wambold, Morris, Condon, and Vinopal, No. 04-CV-417, 2007 WL 879672 at *12-13 (E.D.N.Y. Mar. 21, 2007)(where record is devoid of direct or circumstantial evidence that plaintiff was fired due to his age summary judgment is appropriate).

Additionally, comparative evidence belies Plaintiff's age claim. Younger employees Eric Lombardo and Jean-Claude "J.C." Moos, who were both in their 30s, received PIPs for performance-related issues. (Pl. Dep. p. 23; Sharma Aff. ¶ 56). Likewise, when Defendant discontinued the hard copy Nelson Directories, it laid off Judy Schneider, a woman in her 30s who worked on the Nelson Directories accounts. (Pl. Dep. pp. 180-181). In comparison, Defendant re-assigned Plaintiff to sell another product. (Pl. Dep. 550, 600-602). Plaintiff admitted that Defendant could have laid him off when the Nelson Directories were eliminated, but that Sonders saved his job. (Pl. Dep. pp. 596-598). Plaintiff has not, and indeed cannot, raise an inference of discrimination based on his age.

> **e.      Plaintiff Cannot Meet the "But-For" Standard for an Age Claim.**

Plaintiff ultimately testified that his termination was not based on his age, but rather his disability. (Pl. Dep. p. 492). Plaintiff's own admission defeats his age-related termination claim.

Even assuming, *arguendo*, that Defendant did not reassign every single one of Plaintiff's Nelson Directories book accounts back to him when he returned from leave on November 17, 2008, and that such treatment constituted an adverse employment action -- which it does not -- Plaintiff cannot establish that his age was the "but for" cause, an element of a *prima facie* case. The Nelson Directories were being discontinued in 2008. (Sharma Aff. ¶ 30). Therefore, Defendant was completing these sales by year end, and it would have been illogical to transfer the accounts back to Plaintiff for less than two months. Accordingly, Plaintiff's age could not have been the "but-for" reason Defendant did not transfer Nelson Directories book accounts back to Plaintiff just before Defendant discontinued selling them. Since Plaintiff cannot create a material issue of triable fact as to whether his age was the "but-for" reason for the failure to return accounts to him a month or so before their discontinuation, this claim must be dismissed.

### f.    No Inference of Discrimination Exists Based on Religion.

Plaintiff also alleges that he was discriminated against because of his religion, which he characterizes as "Agnostic Christian."[16] (Boyarsky Aff. Ex. B). Plaintiff's sole allegation in support is that in early 2007[17] Ramos, a non-supervisory, co-worker, twice during a single conversation called him an "atheist" and that when he asked Sharma to intervene, Sharma did not do anything. (Pl. Dep. pp. 217-218, 703; Boyarsky Aff. Ex. B). Clearly, Ramos was not a decision-maker, and Plaintiff did not connect the alleged stray remark[18] to any adverse

---

[16] Plaintiff will treat "Agnostic Christianity" as a protected classification for this motion only.

[17] Defendant maintains that any claim related to Ramos' alleged comment is time-barred. See Point One *supra*.

[18] Even had Plaintiff attempted to connect any of the alleged adverse employment actions to this incident of "religious discrimination," the alleged adverse employment actions were all temporally remote from the timing of this incident and, thus, the incident should not be given weight. See, e.g., Silver v. North Shore Univ. Hosp., 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007)("Stray remarks...are rarely given weight, particularly if they were made temporally remote from the date of decision.")(citations omitted).

employment action.  In this regard, Plaintiff stated during Ramos' deposition that Ramos did not know the difference between an Atheist and an Agnostic.  (Ramos Dep. pp. 16-17, 19).  Plaintiff also stated that he has "no complaints against Iris."[19]  (Ramos Dep. p. 31).  Plaintiff's religious discrimination claim is time barred and must also be dismissed as a matter of law.

### 2.   Plaintiff's Disability Discrimination Claim.

Plaintiff's claims of discrimination based on disability are equally fatal as his claims based on age and religion.  Plaintiff's claims that Defendant discriminated against him by terminating him due to his disability fails as a matter of law.  Although Plaintiff has not articulated a failure to accommodate claim, this claim also fails as a matter of law.

### a.   Plaintiff did not Suffer an Adverse Employment Action.

To establish a *prima facie* case of disability discrimination based on an adverse employment action, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.  Reeves v. Johnson Controls World Servs., 140 F.3d 144, 149-50 (2d Cir.1998).

To the extent Plaintiff asserts a theory of disability discrimination for the same acts/events that he claims age discrimination, i.e., alleged reassignment of accounts, unsatisfactory 2008 performance review, April 2009 PIP and coaching and counseling by Sharma, these claims fail for the reasons discussed in Point II(A)(1)(a)(c).  Plaintiff's disability-termination claim also should be dismissed as a matter of law for the reasons discussed *infra*.

---

[19] Plaintiff no longer contends that Sharma discriminated against him due to his religious beliefs based on this incident or any other. (Pl. Dep. pp. 277, 279-280, 960, 1013).

**b.**   **Plaintiff Was Not Disabled Within the Meaning of the ADA During his Active Employment.**

In order to be covered by the ADA, an employee must have a substantial limitation of one or more major life activities. 42 U.S.C. § 12102(2)(A). The burden rests on the employee to show that the claimed limitation is substantial. Id. See also De La Rosa v. City of New York Police Dep't, No. 09-CV-5290 (SAS), 2010 WL 4177626 at * 13 (S.D.N.Y. Oct. 22 2010). The phrase "substantially limits" suggests "considerable" or "to a large degree." DiFillippo v. Special Metals Corp., No. 09-CV-760 (NAM/ATB), 2011 WL 4595204 at *10 (N.D.N.Y. Sept. 30, 2011) (citations omitted). Although almost any impairment could affect a major life activity, the ADA clearly does not consider every impaired person to be disabled. Joseph v. N. Shore Univ. Hosp., No. 08-CV-3799 (ARL), 2011 WL 573582 at *7 (E.D.N.Y. Feb. 15, 2011)(citation omitted). Therefore, in evaluating whether a plaintiff has a disability, courts have been careful to distinguish between impairments which merely *affect* major life activities from those that *substantially limit* those activities. Joseph, 2011 WL 573582 at * 7.

Plaintiff admitted that he was not disabled while employed by Defendant prior to his leave of absence beginning May 1, 2009. (Pl. Dep. p. 206). Plaintiff's admission is fatal to his disability discrimination claim as it relates to any incident that occurred prior to May 1, 2009. However, to the extent that Plaintiff's disability discrimination claim somehow is not dismissed based on his own admission, Plaintiff testified that he had a "lump the size of a golf ball" protruding from his leg because of an ongoing varicose vein problem in his left foot and lower leg in October 2008.[20] (Pl. Dep. p. 320). Plaintiff was also being treated for a problem with his

---

[20] Plaintiff testified repeatedly that he had twenty-two (22) surgeries in a six week period. (Pl. Dep. pp. 508-509). When presented with his medical records, Plaintiff subsequently changed his testimony that he had 22 injections during one surgery. (Pl. Dep. pp. 397, 512, Boyarsky Aff. Ex. K). His testimony in this regard was characteristic of his other highly questionable testimony – particularly related to his employment history. Paragraphs 270 through

toe around that time, which medical records reveal was an ingrown toenail. (Pl. Dep. p. 205; Boyarsky Aff. Ex. K). Plaintiff did not allege or introduce evidence that his foot and lower leg condition substantially limited any major life activity prior to May 1, 2009.[21]

Plaintiff also claims that he had a bowel problem after he returned from his first leave of absence in November 2008 caused by side effects from an antibiotic called "Keflex" he was taking.[22] Plaintiff does not claim that he was substantially limited in any major life activity as a result of this bowel problem. Rather, Plaintiff simply claims that he needed to use the bathroom frequently. Plaintiff states, in a typically conclusory manner, that his bowel problem rendered him "clearly defined as legally disabled," but Plaintiff cannot establish that he was "disabled" due to his bowel problem. (Pl. Dep. p. 282).

### i.   Plaintiff Could Not Perform the Essential Functions of His Job Beginning in May 2009.

Even assuming that Plaintiff was disabled within the meaning of the ADA beginning on May 1, 2009, Plaintiff cannot establish that he was qualified to perform the essential functions of his job either with or without a reasonable accommodation at anytime thereafter. When Plaintiff took his medical leave of absence beginning May 1, 2009, Plaintiff did not provide any supervisor or Human Resources representative of Defendant any information regarding his medical condition. (Pl. Dep. p. 896). Yet, Plaintiff's doctors told him that he was disabled. (Pl. Dep. p. 402). The doctors allegedly refused to authorize Plaintiff to return to work at any time after May 1, 2009. (Pl. Dep. pp. 493, 756). In this regard, Plaintiff testified that he could not

---

292 of Defendant's Statement of Undisputed Material Facts are examples of Plaintiff's implausible and inconsistent testimony.

[21] Even if Plaintiff were limited in walking, which would be a logical impairment for a foot and lower leg injury, a plaintiff must meet a demanding standard to establish a claim of disability based on difficulties walking. Watson v. Arts & Entm't Television Network, No. 04-CV-1932, 2008 WL 793596 at *13 (S.D.N.Y. Mar. 26, 2008). Plaintiff did not walk without a cane or other assistive equipment. (Pl. Dep. p. 209). Plaintiff fails to meet this standard.

[22] Plaintiff's medical records establish that Plaintiff stopped taking antibiotics in November 2008. (Boyarsky Aff. Ex. FF).

return to work at any time after May 1, 2009. (Pl. Dep. pp. 435, 493-497).   Therefore, Plaintiff was not able to perform the essential functions of his job with or without reasonable accommodation and, thus, his disability discrimination claim fails.   See McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009)(affirming summary judgment because plaintiff provided no evidence that there existed any potential accommodation to enable her to perform the essential functions of her job).   Summary judgment is warranted for Plaintiff's disability termination claim.[23]

### B.   Plaintiff is Unable to Assert a Failure to Accommodate Claim.

Plaintiff may try to claim that Defendant failed to accommodate his disability.[24]   In order to establish a *prima facie* case of disability discrimination for failure to accommodate under the ADA, an employee must demonstrate that: (1) he was an individual who has a disability within the meaning of the statute; (2) the employer had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4) the employer refused to make such accommodation. Joseph, 2011 WL 573582 at * 10.

### 1.   Plaintiff Was Not Disabled within the Meaning of the ADA.

Plaintiff cannot establish that he was "disabled" within the meaning of the ADA during his employment with Defendant.   See Point II(A)(2)(a) *supra*.   Thus, Plaintiff cannot satisfy the

---

[23] In a determination dated August 5, 2011, the Social Security Administration ("SSA") found Plaintiff to be fully disabled and, therefore, eligible for Social Security Disability Insurance ("SSDI") benefits as of April 30, 2009. (Boyarsky Aff. Ex. XX, YY).   A plaintiff who receives disability benefits after claiming he was "totally disabled" and unable to work may be judicially estopped from pursuing an action for disability discrimination against his employer under the ADA claiming he could "perform the essential functions" of his job. See Cleveland v. Policy Mgmt Sys. Corp., 526 U.S. 795, 119 S. Ct. 1597, 1603 (1999).   Plaintiff continues to receive SSDI benefits and admits that no reasonable accommodation exists that would have allowed him to work at any time after April 30, 2009.   Further, Plaintiff's physicians classified him as "disabled" in numerous Attending Physician Statements provided to the SSA between 2009 and 2011.   As such, Plaintiff is judicially estopped from claiming his was terminated wrongfully after April 30, 2009 in violation of the ADA because was incapable of working after April 30, 2009. See also Lincoln v. Momentum Sys. Ltd., 86 F. Supp. 2d 421 (D.N.J. 2000).

[24] Based on absence of such a claim in the Complaint, together with Plaintiff's admission that Defendant did not refuse him any leave or accommodation that he requested, it is unfathomable that Plaintiff somehow asserts a failure to accommodate claim.

first prong of the failure to accommodate test.

### 2. **Plaintiff Did Not Request an Accommodation.**

A reasonable accommodation under the ADA may include, *inter alia*, a modification of job duties and schedules, an alteration of the facilities in which a job is performed, an acquisition of devices to assist the performance of job duties, and, under certain circumstances, a reassignment to a vacant position. 42 U.S.C. § 12111(9)(B). See also Jackan, 205 F.3d at 566. Here, Plaintiff admitted that he did not request any "accommodations" for his alleged disability.[25]

Plaintiff's only request for his foot/leg condition occurred in or around November 2008 when he returned from leave. He requested to be able to change his bandages at his desk and, thus, visible to the sales floor, which Sharma and Sonders granted. (Pl. Dep. pp. 211-212, 404-405). Accordingly, Plaintiff never experienced any resistance from management to change the dressings at his desk. Thus, to the extent that Plaintiff's request could be deemed a request for an accommodation, Defendant accommodated Plaintiff.[26]

Finally, to the extent that Plaintiff requested a leave of absence as an accommodation for his alleged disability -- a claim he has not made, given that he testified he never requested a leave of absence -- Defendant granted Plaintiff's initial leave request and subsequently granted multiple extensions through June 23, 2009, when Plaintiff exhausted his FMLA leave. (Pl. Dep.

---

[25] To the extent that requests for days off to e.g. attend a doctor's appointment, have surgery, recover from surgery, or was otherwise ill, Plaintiff testified that Sharma always granted Plaintiff's requests. Plaintiff specifically testified that Sharma, who was his direct supervisor during the time period in which Plaintiff first needed to have surgery through his last date worked, showed compassion for Plaintiff's medical problems. (Pl. Dep. pp. 209-210).

[26] To the extent Plaintiff claims his doctor's note requesting authorization to use the men's room frequently was a request for an accommodation, Defendant accommodated him. Plaintiff testified that once Sonders made check tally marks on his whiteboard to count the number of times Plaintiff frequented the men's room. Later, Sharma -- who was unaware of the check marks -- asked Plaintiff privately in Sonders' office why he was away from his desk or using the bathroom frequently. Plaintiff explained the reason to Sharma who did not question him any further. Moreover, Plaintiff admitted that nobody stopped him from going to the men's room whenever he needed. (Pl. Dep. pp. 282-283, 297-298, 312-313, 316-320).

p. 573; Boyarsky Aff. Exs. HH-KK).  Thereafter, despite Plaintiff's unwillingness to engage in the interactive process by providing Defendant with documents and information it repeatedly requested, Defendant provided Plaintiff more than *five* months of leave without a single communication or documentation directly from Plaintiff to substantiate his need for leave. Given that Plaintiff did not communicate with Defendant or respond to its requests, Defendant (i) was not obligated to keep Plaintiff's position open indefinitely, (ii) appropriately considered Plaintiff to have abandoned his job and, therefore, (iii) separated his employment.  Starr v. Time Warner, Inc., No. 07-CV-5871 (DC), 2007 WL 4144627 at * 4 (S.D.N.Y. Nov.21, 2007) (the ADA . . . does not require an employer to grant an employee an indefinite leave of absence). Plaintiff did not fulfill his obligation to participate in the interactive process.  See Jackan, 205 F.3d 562.

Plaintiff cannot raise a triable issue of fact regarding a failure to accommodate.  Hence, Plaintiff's hypothetical failure to accommodate claim would fail as a matter of law.

**POINT III:**   **DEFENDANT ARTICUALTED A LEGITIMATE BUSINESS REASON FOR EACH ALLEGED ADVERSE EMPLOYMENT ACTION.**

Assuming *arguendo* that the Court finds that Plaintiff successfully established a *prima facie* case of discrimination based on his age, religion, and/or disability, which is unfathomable, Defendant nonetheless articulated legitimate, non-discriminatory business reasons for the alleged materially adverse employment actions.  The specific claims for which corresponding legitimate, non-discriminatory reasons exist are discussed *infra* but only briefly to avoid duplication of points previously stated.

**A.**   **Reassignment of Clients While Plaintiff was on Leave was Designed to Continue Client Services and was Consistent with Treatment of Plaintiff's Co-Worker.**

As discussed supra, Defendant's decision to have Plaintiff's co-workers Lim and Ramos

handle his Nelson Directory book accounts while he was on leave was appropriate.   It was not done as a penalty to Plaintiff, but rather a strategy to ensure uninterrupted coverage for these clients while Plaintiff was unable to service them.   To the extent Lim and Ramos continued selling the Nelson Directories books – which Plaintiff claimed were "his" accounts -- upon his return from leave, it was done to maintain continuity for a brief period (less than two months) until the product was discontinued.   At the same time, Plaintiff was assigned to sell T-ONE – which did not face elimination.

**B.      2008 Review Reflected Recent Poor Sales Activities.**

The 2008 unsatisfactory performance review accurately reflected Plaintiff's failure to use the TRUST system and inability to close a single sale of T-ONE in 2008.[27]   Sharma, who prepared the review, did not manage Plaintiff during earlier part of 2008.   Finally, the review concentrated on Plaintiff's more recent sales performance; it related to the T-ONE product he was beginning to sell -- not the one Defendant discontinued.   (Sharma Aff. ¶ 42).

**C.      April 2009 PIP was a Response to Plaintiff's Abysmal Sales Performance in 2009.**

Defendant issued Plaintiff a PIP because: (1) Plaintiff did not meet his individual sales target for any month in 2009; (2) Plaintiff had *zero* sales in 2009; (3) Plaintiff did not enter all of his call and sales activity in TRUST as required;[28] and (4) Sharma previously counseled Plaintiff on his performance to no avail. (Pl. Dep. pp. 109-111, 262; Sharma Aff. ¶¶ 44, 49).

Countless federal discrimination cases have held that performance deficiencies are a legitimate, non-discriminatory reason for adverse employment actions even were the PIP to be considered *arguendo* an adverse employment action. See, e.g., Gregory v. Daly, 243 F.3d 687,

---

[27] As discussed in footnote 3, Plaintiff was given credit for a sale actually completed by Sonders.
[28] Defendant also suspected that Plaintiff was falsifying his TRUST entries.  As such, it audited Plaintiff's TRUST entries, as well as the TRUST entries of two additional Business Direct Sales Specialists, in 2009, and found that Plaintiff detailed call activity in TRUST that did not match his telephone activity.  (Pl. Dep. p. 664; Boyarsky Aff. Ex. V).

696 (2d Cir. 2001)("An employer's dissatisfaction with even a qualified employee's performance may provide a legitimate, non-discriminatory reason for the employer's adverse action."); Ragin v. East. Ramapo Cent. Sch. Dist., No. 05-CV-6496 (PGG), 2010 WL 1326779, at *28 (S.D.N.Y. Mar. 31, 2010)(defendant met its burden by providing performance-related reasons for the plaintiff's termination).

**D.**     **Sharma Provided Coaching and Counseling to Rehabilitate Plaintiff.**

Sharma's efforts to meet with Plaintiff, review his sales techniques, practice scripts and review sales performance cannot be objectively interpreted as anything other than support and assistance to drive performance, which is the essence of a sales position.   Although Plaintiff claimed to have disliked Sharma's scrutiny in the Complaint, he testified that Sharma's intentions were sincere and Plaintiff actually benefitted from Sharma's superior sales scripts. (Pl. Dep. pp. 242-243).   Moreover, Plaintiff's belief that Sharma's assistance was unnecessary due to Plaintiff's superior sales acumen is completely belied by his atrocious sales performance since the Fall of 2008.

**E.**     **Defendant Separated Plaintiff After He Failed to Engage in the Interactive Process to Accommodate Plaintiff.**

Defendant similarly had a legitimate business reason for administratively terminating Plaintiff's employment: Plaintiff abandoned his job.   Plaintiff took a leave of absence starting May 1, 2009 for which Plaintiff did not make a written request to Defendant, later did not communicate with his managers or Defendant's Human Resources representatives, disregarded written communications as well as voicemail messages from Human Resources requesting Plaintiff to communicate and provide information/documents and/or did not return to work. Plaintiff testified that he did not read the mail sent by Defendant. (Pl. Dep. p. 746). Furthermore, he conceded that distinct handwriting on the envelopes of the last two letters sent

after he exhausted FMLA leave (and, thus, was on an unauthorized and non-job-protected leave) -- the first letter demanding that Plaintiff provide documents/information or risk termination and the letter second requiring him to report to work in the absence of such documentation -- appeared to be his. (Pl. Dep. p. 483, 486). After months of an apparent attempt to evade -- or at least ignore -- Defendant's communications and efforts, and because Plaintiff did not return to work by November 2, 2009, Defendant considered Plaintiff to have voluntarily resigned.[29]

An employer may take action against an employee who has been absent from his or her job for an extended period of time. See, e.g., Carter v. New Venture Gear, Inc., No. 07-4672-cv, 2009 WL 393611, at * 2 (2d Cir. Feb. 18, 2009)("[Defendant] has met its burden of articulating a legitimate, nondiscriminatory reason for its actions, namely, [plaintiff's] . . . extended absences . . ."). Moreover, an employer is perfectly justified in disciplining an employee who refuses to complete employment paperwork. See e.g., Thornton v. Simpson Thatcher & Bartlett, No. 83-CV-8409, 1986 WL 6012 at *4 (S.D.N.Y. May 21, 1986)(holding that a plaintiff's refusal to sign required documents was a non-discriminatory reason for the employer-defendant to terminate the plaintiff). Defendant attempted to engage in the interactive process with Plaintiff, but Plaintiff refused to cooperate. Plaintiff's repeated refusal to comply with Defendant's extended deadlines and to complete the requested paperwork is a legitimate, nondiscriminatory reason for considering Plaintiff to have abandoned his job in November 2009.

In sum, Defendant has established legitimate, business reasons for its actions, and there is insufficient evidence to infer that any of the alleged adverse employment actions were motivated by discrimination.

---

[29] Plaintiff was transitioned to long-term disability by Hewitt effective November 1, 2009. (Pl. Dep. pp. 433-434, 459, Boyarsky Aff. Ex. VV).

**POINT IV:** **PLAINTIFF CANNOT PROVE THAT DEFENDANT'S LEGITIMATE BUSINESS REASONS WERE ACTUALLY A PRETEXT FOR DISCRIMINATION.**

Because Defendant proffered legitimate, non-discriminatory business reasons for each of the acts about which Plaintiff complains, it is incumbent upon Plaintiff to show that these proffered reasons are not the true reasons, but a mere pretext for discrimination. Gibbs, 2009 WL 754307 at * 4 (citations omitted). Specifically, Plaintiff must come forward with "sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). Plaintiff is unable to do so.

There is simply a lack of admissible evidence to support a rational finding that Defendant discriminated against Plaintiff. Plaintiff provides no evidence other than self-serving and conclusory allegations that Defendant made any decision regarding Plaintiff's employment based on a discriminatory motive. Plaintiff's statements are insufficient to create a triable issue of fact that Defendant's proffered reasons for the challenged employment decisions are false. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.")(internal quotations omitted).

Assuming the Court deems the reassignment of accounts in 2008, the 2008 performance review, the PIP and/or Sharma's focusing on Plaintiff's performance through coaching and counseling to be an adverse employment action, Plaintiff cannot establish that Defendant was not justified by legitimate business reasons. An employer's decisions are given deference by the court unless they are clearly pretextual. See Deabes v. Gen. Nutrition Corp., No. 10-1742-cv, 2011 WL 1054028 at*2 (2d Cir. Mar. 24, 2011). Plaintiff's disagreement with Defendant's

assessment of his work cannot disprove Defendant's asserted reasons for termination or create a question of fact as to pretext. See Ricks v. Conde Nast Publ'g, Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), aff'd, 2001 WL 273835 (2d Cir. 2001); Sicular v. NYC Dep't of Homeless Services, No. 09 Civ. 0981(AKH)(AJP), 2010 WL 423013 at *21 (S.D.N.Y. Feb. 4, 2010)(granting summary judgment to employer and holding that where employee disputed some of employer's claims of insubordination, no material issue of fact was created). Further, Plaintiff's allegations of discrimination cannot reasonably support his contention that the real reason for negative treatment -- such as the 2008 review and 2009 PIP -- was not his poor performance, but rather his membership in a protected classification. See, e.g., Vermette v. Verizon Wireless, No. 09-CV-6085, 2011 WL 3902757 at *9 (W.D.N.Y. Sept. 6, 2011).

### A.    Conclusory Allegations Cannot be Used to Establish Pretext.

Most of Plaintiff's allegations of discrimination relating to his poor reviews and the PIP are based on conclusory statements and Plaintiff's inflated feelings and perceptions of his own self-worth, i.e., "he is the best salesman he ever met." (Pl. Dep. pp. 109-111, 246, 551). His statements are insufficient to show pretext. See Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996)(assertion of personal beliefs is insufficient to show pretext), cert. denied, 520 U.S. 1228, 117 S. Ct. 1819, 137 L. Ed. 2d 1027 (1997). See also Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y. 1995)(to prove discrimination, "plaintiff must do more than simply disagree with his employer's business decisions").

### B.    Plaintiff Cannot Show Pretext Through Comparative Evidence.

A plaintiff may also establish pretext "by proving that ,similarly situated' employees were treated more favorably than he." Hargett v. National Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996). In order to be "similarly situated," other employees must have (1) reported to the same supervisor as plaintiff, (2) been subject to the same standards governing

performance evaluation and discipline, and (3) engaged in conduct similar to plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.  Francis v. Runyon, 928 F. Supp. 195, 203 (E.D.N.Y. 1996).

Plaintiff does not identify any similarly-situated individual who was treated more favorably than him based on his age, religion or disability.  To the contrary, Lim's accounts were assigned to other sales people when she was on a maternity leave. (Sharma Aff. ¶ 38). Lombardo and Moos, two men in their early 30s who were not disabled, received PIPs from Sonders and Sharma. (Pl. Dep. p. 23; Sharma Aff. ¶ 56).  Moos was terminated for sales performance in January 2009, although Plaintiff was retained when he made zero sales.  (Sharma Aff. ¶ 57).  Defendant also issued a PIP to Sanchez, who was in his 20s and not disabled. (Sharma Aff. ¶ 56).  Also, Defendant laid off Schneider, who was in her 30s and solely supported Nelson Directories, when it discontinued selling Nelson Directories, while Defendant retained Plaintiff and gave him a new role. (Pl. Dep. pp. 180-181).  Finally, with regard to Defendant's decision to separate Plaintiff's employment, Plaintiff has not identified any individual who was granted an indefinite leave of absence based on a disability or otherwise. Under these circumstances, Plaintiff cannot establish pretext.

**POINT V:**  **PLAINTIFF CANNOT PROVE THAT HE WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED ON HIS AGE, RELIGION OR DISABILITY.**

In his Complaint, Plaintiff alleges that he was subjected to a hostile work environment. Plaintiff has abandoned all claims of harassment by anyone other than Sonders. (Pl. Dep. pp. 277, 279-280, 960, 1013**).**

Harassment is actionable when it creates a hostile work environment which is "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [plaintiff's] employment were thereby altered."  Feingold v. New York, 366 F.3d

138, 150 (2d Cir. 2004)(citations omitted); Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 285 (S.D.N.Y. 2006).   To prevail on a claim of hostile work environment, a plaintiff must establish two elements: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. Petrosino, 385 F.3d at 221.   Satisfying this standard entails "showing both „objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment,' and the [plaintiff] must also subjectively perceive that environment to be abusive." Feingold, 366 F.3d at 150 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).

To analyze a hostile work environment claim, courts consider the totality of the circumstances, taking into account a variety of factors, including its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Sims v. City of New York, No. 08-CV-5965 (JGK), 2010 WL 3825720 at *11 (S.D.N.Y. Sept. 29, 2010)(citations omitted).   As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Terry v. Ashcroft, 336 F.3d 128, 147–148 (2d Cir.2003).   Federal anti-discrimination statutes are not intended to create a generalized civility code for the workplace: thus, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino, 385 F.3d at 223.   Minor incidents do not merit relief. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 240 (2d Cir. 2007).

**A.**     **Plaintiff's Hostile Work Environment Age Claim is Based Solely on Sonders' "Old Man" Comments, Which Fail as a Matter of Law.**[30]

Plaintiff's only evidence of a hostile work environment based on age stems from Sonders allegedly "incessantly" calling him "old man" in a malicious way.  Plaintiff does not allege that anyone else called him the same or similar names in a malicious way.

In the Second Circuit, a hostile work environment claim faces a remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present.  DelaPaz v. N.Y. City Police Dep't, No. 01-CV-5416 (CBM), 2003 WL 21878780 at *3 (S.D.N.Y. Aug. 30, 2003).  Since Plaintiff's testimony regarding the relevant time period and frequency of Sonders' statements is replete with inconsistencies, it cannot create a triable issue of fact.  See Jeffreys, 426 F.3d at 551.  Plaintiff's claim is further belied because by his inability to provide a single witness who heard Sonders call him "old man" despite working on an open sales floor.

Even assuming, *arguendo*, that the Court was to credit Plaintiff's testimony as factual, Sonders' statements did not create an objectively hostile work environment given the surrounding facts and circumstances.  Despite Plaintiff claiming that he perceived Sonders' demeanor when calling him "old man" to have changed at some unidentified time,[31] Plaintiff must show the environment was objectively hostile and abusive – not merely that it was his perception.  Sims, 2010 WL 3825720 at * 11.

Yet, Plaintiff's testimony belies even a subjective belief that Sonders calling him "old man" was offensive.  Plaintiff admitted that he did not take issue with Sonders calling him "old man."  (Pl. Dep. pp. 772-774).  No reasonable trier of fact could conclude that after hearing the

---

[30] At least one Court held that the ADEA does not provide for hostile work environment claims.  Ehmann v. Good Samaritan Hospital Medical Center, 2010 N.Y. Misc. LEXIS 4577 at *15 (Sup. Ct. Nassau Co. Sept. 20, 2010).

[31] Plaintiff first testified that he did not feel harassed by Sonders until March or April 2008, but later testified that Sonders' demeanor changed at some time in 2007.  (Pl. Dep. pp. 420, 772).  Plaintiff's inability to keep his own story straight should be extremely persuasive evidence that Plaintiff has not testified truthfully.

exact same comment stated, without objection, over a period of time, it suddenly transformed into a hostile work environment. Further, the alleged statements did not interfere with his job; Plaintiff's performance problems were concentrated in 2009, when Plaintiff testified that Sonders did not speak to him.

Finally, Plaintiff drew attention to his age and constantly highlighted the ages of his younger co-workers thus, significantly diminishing any negativity attributed to age-related comments. Plaintiff testified that he regularly called his coworkers – who were largely in their 20s and 30s – "kids," "the 20-something crowd" and "the Fake Book crowd." (Pl. Dep. pp. 525-527, 532-533). Plaintiff continuously made ageist comments directed at co-workers who were significantly younger than him. Accordingly, he cannot show the alleged statements by Sonders were "severe and pervasive" under either an objective or a subjective standard.[32]

**B.     Plaintiff's Hostile Work Environment Claim Based on Disability is Legally Unsustainable.**

The Second Circuit has not expressly held that a hostile work environment claim is cognizable under the ADA. Farina v. Branford Bd. of Educ., 2010 WL 3829160 (2d Cir Nov. 18, 2011). See also Ragusa v. Malverne Union Free Sch. Dist., 2010 WL 2490966 (2d Cir. 2010). Nonetheless, Plaintiff cannot establish that he suffered a hostile work environment based on an alleged disability.

**1.      The Nature and Circumstances Surrounding the Alleged Comments do not Support Plaintiff's Hostile Work Environment Claim.**

Plaintiff does not allege any disability-related comments to create a hostile work environment. Plaintiff alleges that Sonders said "your leg is gangrene" and "your leg is going to

---

[32] Plaintiff testified he actually enjoyed when his coworkers attempted to guess how old he was, and didn't consider any jokes about his age made by his coworkers to be discriminatory, as compared to finding it discriminatory when Sonders joked that Plaintiff was present at various historical events. (Pl. Dep. 524-525). Plaintiff's characterization of Sonders' comments is untenable.

fall off." (Pl. Dep. pp. 213-215).  Yet, Plaintiff showed his co-workers and managers his leg when he changed his bandage at his desk in plain view. (Pl. Dep. pp. 211-212).  Were someone to make a factual comment about the appearance of Plaintiff's leg, after which Plaintiff exposed his leg to him/her, such statement is not necessarily hostile.  Nevertheless, the alleged statements by Sonders do not alone suggest animosity.  Even were Plaintiff offended by the alleged comments -- which is questionable given Plaintiff's lack of inhibition about showing his leg -- mere "workplace bullying" is insufficient to create an actionable hostile work environment claim.  De la Cruz, 783 F. Supp. 2d at 638.

### 2. Plaintiff Failed to Link any Hostility to his Conditions of Employment.

Further, courts have held that references to a plaintiff at various times as a "lame duck" and "crippled" show -- at most -- "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct," that a reasonable employee would not find the conditions of his employment altered for the worse.  Smith v. Reg'l Plan Ass'n, No. 10-CV-5857 (BSJ)(KNF), 2011 WL 4801522 at *6 (SDNY Oct 7 2011)(citing Petrosino, 385 F.3d at 223).  "Everyone can be characterized by [a] []real or perceived[] disability, and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 373.  Plaintiff has not come forward with any showing of specific facts as to how these actions could be considered "extreme [enough] to amount to a change in the terms and conditions of employment."  See De la Cruz, 783 F. Supp. 2d at 644-645 (finding allegations of work reassignment, changes in work schedule, increased scrutiny of his work, and supervisor's

stray remarks regarding seniority and physical fitness to be insufficient).[33]

Complaints of name calling and derogatory remarks regarding a disability as well as negative attitude towards Plaintiff are not evidence that the workplace was permeated with "frequent, severe and offensive disability-related comments" to meet the demanding standard of a hostile work environment claim. De La Rosa, 2010 WL 4177626 at * 13.  As such, Plaintiff's claim of a hostile work environment based on disability should be dismissed as a matter of law.

Assuming *arguendo* that a hostile work environment claim based on disability is recognized in the Second Circuit, a plaintiff claiming hostile work environment based on disability must demonstrate that he is a member of the protected class to have standing to assert a viable claim. Weiss v. Hustedt Chevrolet, No. 05-CV-4230 (DRH) (MLO), 2009 WL 2132444, at *8-9 (E.D.N.Y. July 13, 2009).  Plaintiff was not disabled within the meaning of the ADA between 2006 and April 30, 2009.  Thus, Plaintiff cannot sustain a claim of a hostile work environment based on a disability.[34]

**C.    In the Spring of 2009 Sonders Authorized a Bonus to Plaintiff He Did Not Deserve.**

Plaintiff's allegations that Sonders harbored any discriminatory bias towards him is

---

[33] As discussed *infra* in footnote 26, in December 2008 Sonders allegedly tracked the number of times Plaintiff went to the bathroom by placing tally marks on a whiteboard in his office.  Plaintiff did not provide any evidence of these tally marks.  Nonetheless, after Plaintiff told Sharma that he provided a doctor's note to HR related to his bathroom use, Sharma did not ask again.  Finally, Plaintiff testified that he was never denied bathroom privileges and was able to use the bathroom whenever he needed. (Pl. Dep. pp. 282-283, 297-298, 312-313, 316-320).

[34] While the ADA protects against discrimination based on a perceived disability, this is not a perceived disability case as Plaintiff has never alleged a perceived disability claim in the Complaint or in his four days of deposition testimony.  To the extent Plaintiff were to assert such a claim in the first instance, it would fail as untimely as well as Plaintiff's inability to establish a *prima facie* case.  A perceived disability claim may be proved by showing either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Airlines, Inc., 527 U.S. 471, 489-490, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).  Plaintiff cannot establish that Defendant mistakenly believed he had an impairment or perceived a nonlimiting impairment that substantially limited a major life activity.  Plaintiff further cannot show an adverse employment action based on his perceived medical condition related to his foot/leg.  Moreover, Defendant accommodated his requests that related to his medical condition, i.e., it permitted him to change his bandage at his desk.  Finally, Plaintiff testified that Sharma showed compassion and understanding for his condition. (Pl. Dep. pp. 211, 318-319, 322-323, 399-400).  Therefore, a perceived disability claim would fail as a matter of law.

further belied by the fact that in early April 2009 Sonders decided to award Plaintiff a $5,000 bonus on a recent successful sales team campaign, despite the fact that Plaintiff did not contribute at all to the campaign.  (Pl. Dep. pp. 590-596; Boyarsky Aff. Ex. U).  Plaintiff admitted that he did not deserve the bonus.  (Pl. Dep. p. 591**).**

    **D.**    **"Atheist Comment" by Ramos Cannot Establish a Hostile Work Environment.**

Any hostile work environment claim based on religion – to the extent not dismissed as untimely – relates solely to two alleged statements by a non-supervisory co-worker, Ramos, who asked whether Plaintiff was an Atheist in a single conversation. (Pl. Dep. pp. 217, 227).  Such statements or questions are at best stray remarks and patently insufficient to establish a religion-based hostile work environment.  <u>Faison v. Leonard St., LLC</u>, No. 08-CV-2192, 2009 WL 636724 at *3 (S.D.N.Y. Mar. 9, 2009)(dismissing religion-based hostile work environment claim where "[t]he Amended Complaint allege[d] one remark by [defendant] that raised the issue of the plaintiff's religion").  Further, conduct involving religion cannot create a religious hostile work environment unless it is in some way abusive, disparaging or coercive with respect to the plaintiff, and is motivated by religious animus.  <u>Ennis v. Sonitrol Mgmt. Corp.</u>, No. 02-CV-9070 (TPG), 2006 WL 177173 at *10 (S.D.N.Y. Jan. 24, 2006).  Hence, Plaintiff's claim of a religion-based hostile work environment fails as a matter of law.

**POINT VI:**    **PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT RETALIATED AGAINST HIM DUE TO HIS COMPLAINT OF DISCRIMINTION.**

Plaintiff complains that Defendant retaliated against him in early 2009 after he informed Defendant that he would be filing a charge of discrimination with the EEOC.  It is significant that Plaintiff never complained but rather he told his manager after receiving a bad performance evaluation that he was filing an EEOC Charge.  Defendant disputes that the Threatened Charge constituted a complaint, <u>i.e.</u>, protected activity.

To establish a prima facie case of retaliation, Plaintiff must show that: (1) he participated in a protected activity; (2) the employer was aware of that activity; (3) he was subject to a material adverse employment decision; and (4) the adverse employment decision resulted from the protected activity, i.e., a causal connection between the protected activity and the adverse employment action. See Blanco v. Brogan, 620 F.Supp.2d 546, 553 (S.D.N.Y. 2009). See also, Holtz v. Rockefeller Ctr., Inc., 258 F.3d 62, 79 (2d Cir. 2001).  Even if the threat to file an EEOC Charge (referred to herein as the "Threatened Charge") is deemed a "protected activity," Plaintiff cannot establish that he was subjected to a material adverse employment decision or a causal connection between the Threatened Charge and any alleged adverse employment action.

The only two employment actions that took place after the Threatened Charge and Human Resources investigation in January 2009 were the issuance of Plaintiff's PIP in April 2009 and his administrative termination in November 2009.  As discussed *supra* in Point II(A)(1)(c)(v), a PIP is not considered an adverse employment action.  Accordingly, the PIP was not an adverse action that could form the predicate for a prima facie case of retaliation.  Also as discussed *supra* in Point II(A)(1)(c)(vi), Plaintiff abandoned his job which cannot be considered a predicate for a retaliation claim.

However, to the extent that either the PIP or Plaintiff's administrative termination could be considered an adverse employment action, which they are  not, Plaintiff cannot establish a causal connection between his Threatened Charge and either the PIP or his administrative termination in November 2009.  Proof of causation can be shown: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2001).

Plaintiff has provided no evidence of retaliatory animus or disparate treatment of a colleague who engaged in similar protected conduct (assuming *arguendo* the Threatened Charge is considered protected activity). Plaintiff further cannot show that his protected activity was followed closely by discriminatory treatment. An inference of causation is defeated by: (1) the allegedly retaliatory action taking place at a sufficiently distant time after the protected activity; or (2) an "intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).

In order to rely on temporal proximity alone, the two events must be "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001). Typically periods longer than two-months do not establish a causal connection indicative of retaliation. See, e.g., Stoddard v. Eastman Kodak Co., No. 07-1783-cv, 2009 WL 367553 at *3 (2d Cir. Feb. 13, 2009)(two months is insufficient to establish a causal relationship); Ruhling v. Tribune Co., No. 04-CV-2430 (ARL), 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007)("this Circuit [has] consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line").

While the Threatened Charge took place in January 2009, the PIP did not occur until April 2009. (Boyarsky Aff Exs. Q, Y). Viewing Plaintiff's allegations in the light most favorable to him, approximately three full months passed between the Threatened Charge and the PIP, which is too attenuated to establish that Plaintiff's complaint caused Defendant to issue Plaintiff a PIP.[35]

---

[35] For same the reason the PIP is not an adverse employment action and not retaliatory, the TDP (issued to approximately a dozen other employees) cannot form the predicate for a retaliation claim. Moreover, where timing

Similarly, Plaintiff cannot establish that he was terminated in retaliation for his Threatened Charge or his participating in the investigation by Glen Russo ("Russo"), Defendant's Vice President, Labor Relations, who encouraged Plaintiff to provide information for an investigation after Plaintiff advised of the Threatened Charge. (Boyarsky Aff. Exs. AA, CC).  The ten month interval between Plaintiff's Threatened Charge and his administrative termination in November 2009 clearly is far too attenuated to establish a causal connection. Even using the date Russo completed his investigation on or about February 6, 2009 as the trigger date, the lapse between the termination and the investigation was nine months, again excessively tenuous and insufficient to create a causal connection.

Moreover, the existence of material intervening events between (a) either the Informal Complaint and/or Russo's investigation and (b) the administrative termination severs any potential causal connection.  Specifically, Plaintiff's total lack of sales and failure to comply with Defendant's repeated requests for documentation supporting his need to continue providing him leave. (Pl. Dep. p. 896; Boyarsky Aff. Exs. MM, OO – SS).  Plaintiff's allegation that his termination was retaliatory is further belied by Defendant's grant of additional leave despite Plaintiff disregarding Defendant's requests.

Consequently, no reasonable trier of fact could conclude that the PIP and/or administrative termination constitute retaliation for which Plaintiff's retaliation claim fails.

**POINT VII:**   **DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE DISCRIMINATION CLAIMS BECAUSE IT EXERCISED REASONABLE CARE TO PREVENT AND TO PROMPTLY CORRECT DISCRIMINATION, HARASSMENT AND RETALIATION.**

In the absence of a tangible employment action, a defendant employer is entitled to

---

is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir.), cert. denied, 534 U.S. 951 (2001).

summary judgment where (1) it exercised reasonable care to prevent and promptly correct any discriminatory or harassing behavior and (2) the plaintiff unreasonably failed to take advantage of the employer's preventive or corrective opportunities. See Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275 (1998); Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998). The promulgation and application of an employer's equal employment opportunity policy describing internal complaint procedures constitutes reasonable efforts to prevent discrimination. Eichler v. Amer. Int'l Grp., No. 05-CV-5167 (FM), 2007 WL 963279 at *9 (S.D.N.Y. Mar. 30, 2007).

Here, Defendant maintained a Code of Conduct containing a policy prohibiting discrimination, harassment and retaliation in the workplace that it made available to all employees on Defendant's intranet. (Boyarsky Aff. Ex. A). Additionally, Defendant immediately took steps to promptly investigate Plaintiff's allegations of discrimination and harassment, and indeed initiated an investigation without a formal complaint. (Boyarsky Aff. Ex. BB). Finally, Plaintiff never complained to Defendant about the allegations which are the subject of the instant lawsuit.[36]

Russo met with Plaintiff on January 16, 2009 to determine the exact nature of Plaintiff's allegations, immediately after Plaintiff made the Threatened Charge. (Boyarsky Aff. Ex. BB). After the first interview, Plaintiff refused to provide the information Russo requested, but later relented and met with him a second time (on January 22, 2009) although he did not provide the documents Russo requested. (Boyarsky Aff. Exs. BB-DD). Plaintiff, who purposely decided not to complain to Defendant, met with Russo on two occasions and spent more than eight hours combined in the interviews. (Pl. Dep. p. 542).

Russo investigated each of the allegations -- none of which identified Plaintiff's age or

---

[36] Plaintiff testified that "only stupid people go to Human Resources." (Pl. Dep. pp. 639, 686, 694).

disability as a basis for a claim. Moreover, the extensive report Russo prepared did not state a single improper remark by Sonders despite Plaintiff's testimony that Sonders continuously called him an "old man" or that Sonders said "your leg is gangrene" and "your leg is going to fall off." (Boyarsky Aff. Ex. BB). Plaintiff also acknowledged that Defendant's response to his complaints was satisfactory. (Boyarsky Aff. Ex. DD). Following a full investigation, Russo prepared a comprehensive report in which he did not find any evidence of discrimination, harassment or retaliation. On February 12, 2009, Russo met with Plaintiff and informed Plaintiff that he was unable to substantiate his allegations. (Boyarsky Aff. Exs. BB, EE). Plaintiff did not approach Human Resources to complain of any further discrimination or harassment after the initial investigation that concluded in February 2009.

On or about April 6, 2009, Plaintiff complained to Human Resources that coworker, Vince Laurenzo, discriminated against him by saying words to Plaintiff in the men's room to the effect of "you have to pull your pants down to piss." (Pl. Dep. p. 423-425). After Plaintiff complained, Human Resources investigated and issued a written warning to Laurenzo based on this incident. Human Resources took Plaintiff's complaint seriously, investigated the complaint, and immediately took remedial action. (Boyarsky Aff. Ex. GG).

Given (1) Defendant's policy prohibiting discrimination, harassment and retaliation; (2) Plaintiff purposely chose not to complain but only relented at Defendant's insistence to participate in an investigation; (3) Defendant fully investigated Plaintiff's allegations; (4) Defendant found no instances of harassment or discrimination; and (5) following an actual, later complaint Defendant expeditiously remedied the situation, Defendant cannot be held liable for any alleged discrimination or harassment. Woods v. American Stock Exch, No. 95-CV-5646 (JSR), 1997 WL 151453 at *1 (S.D.N.Y. Apr. 1, 1997) (Rakoff, J.)(employer immediately and

comprehensively investigated a complaint which precluded employer liability for alleged harassment)(citations omitted).

## POINT VIII: PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE HE HAS SUFFERED NO DAMAGES.

Even if Plaintiff were to prevail on any of his claims, which he cannot, Plaintiff is not entitled to compensatory damages for lost wages and lost medical benefits because Plaintiff did not suffered any damages while employed (through November 5, 2009).[37]

Plaintiff received all available benefits pursuant to Defendant's policies.[38] He received full pay and, subsequently, short-term disability ("STD") while he was incapable of working but employed by Defendant. The long-term disability ("LTD") benefits began immediately thereafter and continue prospectively. Further, Plaintiff disregarded Defendant's communications -- which he considered "clutter" -- that could have enabled him to continue benefits through COBRA for eighteen months following his termination.[39] Plaintiff cannot blame Defendant for his loss of fringe benefits he forfeited as a result of his own actions or inactions. See Bonura v. Chase Manhattan Bank, NA., 629 F.Supp. 353, 355 (S.D.N.Y.1986), aff'd, 795 F.2d 276 (2d Cir.1986).

Based on Plaintiff receiving all of the fringe benefits to which he was entitled while on

---

[37] Plaintiff is not protected under the ADA after April 30, 2009 because he was incapable of working. See Point II.A.2.c. supra.

[38] From May 1, 2009, the first day of Plaintiff's medical leave through the exhaustion of his FMLA leave on June 23, 2009, Plaintiff received STD benefits at full pay. (Pl. Dep. pp. 433, 460, 465; Boyarsky Aff. Ex. LL). From June 24 through October 31, 2009, Plaintiff received STD benefits at 80% of his pay. (Boyarsky Aff. Ex. NN). He then began receiving LTD benefits at 60% of his pay through Defendant's LTD policy with The Hartford and subsequently was granted federal SSDI benefits retroactive to April 30, 2009. (Boyarsky Aff. Ex. VV). Plaintiff's administrative termination on November 5, 2009 had no effect on Plaintiff's continued receipt of LTD benefits which Plaintiff has been receiving until the current time. (Boyarsky Aff. Ex. 51). Plaintiff's LTD benefits provide $2,500 per month paid by Defendant. He receives SSDI benefits of $1,583.00 per month. Plaintiff also received a lump sum SSDI payment of $34,652.00 in September 2011 representing retroactive SSDI benefits.

[39] Plaintiff received a letter in November 2009 stating that he could elect COBRA until February 1, 2010. (Boyarsky Aff. Ex. UU). Plaintiff testified that he attempted to elect COBRA in December 2009, but he failed to remit payment for within the time limit stated in multiple letters from Hewitt. Plaintiff testified that his late check in December 2009 resulted in a loss of ability to receive COBRA benefits, but his election period did not expire until February 1, 2010.

leave combined with Plaintiff receiving SSDI benefits (including through the present) retroactive to April 30, 2009, the first day he was unable to work, Plaintiff is not entitled to any compensation should any of his claims of discrimination or harassment be successful. See generally Saulpaugh v. Monroe Community Hospital, 4 F.3d 134 (2d Cir. 1993).

**POINT IX:   PLAINTIFF IS NOT ENTITLED TO DAMAGES AFTER OCTOBER 4, 2011 BASED ON AFTER-ACQUIRED EVIDENCE.**

The "after-acquired evidence" doctrine established by the United States Supreme Court permits employers to limit their liability for unlawful termination claims by introducing evidence of an employee's wrongdoing that the employer discovers after the employee is terminated, even if the conduct was not known prior to the employee's actual termination. See McKennon v. Nashville Banner Publishing, Co., 513 U.S. 352, 361 (1995). To support an after-acquired evidence defense, a Defendant "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id. at 363. If a valid defense is asserted, a front pay may not be awarded, and absent extraordinary equitable circumstances the "formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." McKennon, 513 U.S. at 362.

Defendant's employment application specifically states that the employee understands that the falsification, misrepresentation, or omission of facts provided by the employee in connection with the application will be cause for denial of employment or immediate termination of employment. (Boyarsky Aff. Ex. AAA). Plaintiff signed his employment application in 2006 containing the following disclaimer:

> I hereby certify that all of the information provided by me in this application (or any other accompanying or required documents) is correct, accurate and complete to the best of my knowledge. I understand that the falsification, misrepresentation or omission of

> any facts in said documents will be cause for denial of employment
> or immediate termination of employment regardless of the timing
> or circumstances of discovery.

At Plaintiff's deposition, Defendant first learned of numerous material misrepresentations and omissions made by Plaintiff in his resume and employment application he submitted in connection with his re-hiring in 2006. (Pl. Dep. pp. 100-101, 114-115, 118-120, 129-131; Boyarsky Aff. Exs. C, AAA, ZZ). He intentionally did not disclose his employment with Bloomberg, a main competitor of Defendant, in 2000, which according to personnel records produced by Bloomberg was replete with performance deficiencies similar to those that Plaintiff experienced toward the end of his employment with Defendant.[40] (Pl. Dep. pp. 55, 70, 99-101; Boyarsky Aff. Ex. BBB). Plaintiff intentionally misrepresented his prior period of employment with Defendant, his period of employment with Northeastern University, his level of employment and the compensation he received from Northeastern, and likewise the dates of his employment with the New York City Department of Education ("NYCDOE") -- which are inconsistent and show a shorter period than those produced by the NYCDOE.[41] (Pl. Dep. pp. 39-

---

[40] Plaintiff testified that he only worked for Bloomberg from May until mid-June 2000, but employment records provided by Bloomberg clearly establish that Plaintiff was employed from May through the end of July 2000. Plaintiff was employed by Bloomberg twice as long as he testified. (Pl. Dep. pp. 26, 101; Boyarsky Aff. Ex. E). Plaintiff additionally testified that he "quit" from Bloomberg, but Plaintiff received severance through October 2000 and signed a release of claims when he left Bloomberg. (Boyarsky Aff. Exs. E, BBB). Plaintiff's receipt of severance given his very brief tenure suggests Plaintiff did not voluntarily resign.

[41] Plaintiff purposely failed to include his Bloomberg employment on his resumé or his 2006 employment application. Plaintiff listed on his resumé that he was a "professor" at Northeastern University ("Northeastern") from 1995 to "present" (i.e., 2006), but the last time he taught a class at Northeastern was in 1999. His employment application with Defendant similarly states that he received compensation from Northeastern "to present," i.e., 2006, but he did not receive pay from Northeastern after 1999. (Boyarsky Aff. Ex. AAA). When confronted about these misrepresentations, Plaintiff testified that he wanted to forget about his experience at Bloomberg and thus "filled in the gap" in his resumé, and then characterized the Northeastern University job as a "relationship" rather than "employment," stating that he has an ongoing "relationship" with Northeastern and can return to teaching there at any time, despite not having spoken to anyone at Northeastern since 1999. (Pl. Dep. pp. 57, 99-100). He further testified that anyone "in academia" would understand that this was a continuing "relationship" and not continued employment. (Pl. Dep. p. 61). Plaintiff admits that Defendant is not "in academia" and thus would not understand the distinction. (Pl. Dep. pp. 69-70). Finally, while Plaintiff's resumé and employment application state that he was employed by the NYCDOE as a "teacher" from 2003 through 2006, employment records provided by the NYCDOE establish that he was employed as a *substitute* teacher, that he started working for the NYCDOE in September 2004, and that he resigned from his position in early 2005. (Boyarsky Aff. Ex. DDD).

40, 69-70; Boyarsky Aff. Exs. CCC, DDD).  In short, Plaintiff falsified these documents which if known at the time would have prevented his hiring in the first place.

Defendant would not have hired Plaintiff had it been aware that his resumé and employment application contained material and intentional inaccuracies and omissions when Plaintiff applied for a position in 2006, and further would have terminated his employment immediately had Defendant been made aware of this information.[42]  Defendant advised Plaintiff accordingly in a letter dated November 28, 2011. (Boyarsky Aff. Ex. ZZ).  Therefore, pursuant to the after-acquired evidence doctrine in McKennon, even if Plaintiff's claims were to survive summary judgment, any potential claim for back pay should be cutoff as of October 4, 2011, the date Defendant first learned that Plaintiff's fabrications and misrepresentations.

## CONCLUSION

Based on the foregoing, Defendant respectfully requests that this Court enter an Order granting its Motion for Summary Judgment and dismissing the Complaint in its entirety.

---

[42]Plaintiff history of material misrepresentations in his employment records is not limited to Defendant's employment.  Plaintiff misrepresented his employment and salary history regarding Northeastern on his application for a position with the NYCDOE and on his application for a position with Bloomberg. (Boyarsky Aff. Exs. D, DDD).  Additionally, Plaintiff misrepresented his employment history in his EEOC Charge, which states that Plaintiff was employed by A.G. Edwards -- where he never worked. (Boyarsky Aff. Ex. B; Pl. Dep. pp. 133, 990-991).