UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
CHARLES F. McGRATH, JR.,          : 10 Civ. 4944 (JSR) (JCF)
                                  :
          Plaintiff,              :       REPORT AND
                                  :       RECOMMENDATION
                                  :
     - against -                  :
                                  :
THOMSON REUTERS,                  :
                                  :
          Defendant.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:

     Charles McGrath, proceeding pro se, brings this action against
Thomson Reuters, Inc. pursuant to Title VII of the Civil Rights Act
of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age
Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §
621 et seq.; and the Americans with Disabilities Act of 1990 (the
"ADA"), 42 U.S.C. § 12112 et seq.  Mr. McGrath alleges that while
he was employed by the defendant between 2006 and 2009 he was
subject to a panoply of discriminatory acts based on his religion,
age, and disability; experienced a hostile work environment; and
faced retaliation by Thomson Reuters for threatening to file a
charge of discrimination with the Equal Employment Opportunity
Commission (the "EEOC").

     Thomson Reuters has moved for summary judgment. It contends
that: (1) some of Mr. McGrath's claims are time-barred; (2) he has
failed to establish a prima facie case of employment

1

discrimination; (3) to the extent that Thomson Reuters took any adverse employment actions against Mr. McGrath, such actions were based on legitimate, non-pretextual business reasons; (4) Mr. McGrath was never subjected to a hostile work environment; (5) he has failed to prove that Thomson Reuters retaliated against him due to his EEOC charge; (6) Thomson Reuters took reasonable care to prevent and promptly correct any discrimination, retaliation, or harassment; (7) Mr. McGrath has suffered no damages; and (8) any damages Mr. McGrath might have suffered after October 4, 2011 are barred because they would have terminated him on that date based on after-acquired evidence. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment dated Jan. 6, 2012 ("Def. Memo.") at 3-4). For the reasons given below, I recommend that the defendant's motion be granted.

Background

Thomson Reuters and its predecessor, Thomson Corporation,[1] employed Mr. McGrath for three separate periods of time. (Deposition of Charles McGrath ("McGrath Dep."), attached as Exh. EEE to Boyarsky Aff., at 67-68, 113, 134, 141; Sharma Aff., ¶ 4).

---

[1] Prior to April 2008, Thomson Corporation and Reuters Group PLC were separate corporations. In April 2008, Thomson acquired Reuters Group, and the merged company was renamed Thomson Reuters, the defendant in this case. (Affidavit of Devanand Sharma ("Sharma Aff."), attached as Exh. JJJ to Affidavit of Mitchell Boyarsky dated Jan. 6, 2012 ("Boyarsky Aff."), ¶ 3).

The first lasted from March 1999 until the plaintiff's voluntary resignation in May 2000 to take a position at Bloomberg LP ("Bloomberg"). (McGrath Dep. at 26-27, 67-68, 100-01, Employment Application Documents from Bloomberg L.P., attached as Exh. D to Boyarsky Aff.).[2] Apparently Mr. McGrath never informed Thomson of his employment at Bloomberg and, in fact, intentionally omitted any reference to Bloomberg from his résumé when he successfully re-applied for his second period of employment at Thomson. (Sharma Aff., ¶ 4, McGrath Dep. at 99-100). The second period, during which Mr. McGrath was employed as a Sales Representative in Thomson's Treasury Solutions Group, stretched from December 2000 through September 10, 2001, when he was laid off along with the rest of the Treasury Solutions Group's employees as part of the sale of that group. (McGrath Dep. at 67-68, 99, 101, 113; Sharma Aff., ¶ 4). The final term of Mr. McGrath's employment by the defendant, from which this case arises, lasted from August 2006 through November 5, 2009, when Thomson Reuters terminated him for failing to return from a medical leave of absence. (Rule 56.1 Statement, ¶ 3; Complaint).

---

[2] Mr. McGrath's employment at Bloomberg lasted from May 2000 through July 2000, when he resigned because he "wasn't a fit" there and "the place was a nightmare . . . a sweatshop." (Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Rule 56.1 Statement"), ¶ 9; McGrath Dep. at 26-28, 100-01).

In August 2006, the Managing Director of Thomson Corporation's Business Direct Group, Mark Sonders, and one of the Business Direct Group's two Sales Managers, Devanand ("Dave") Sharma, interviewed and hired the plaintiff. (Sharma Aff., ¶¶ 5, 6; McGrath Dep. at 134-36). At that time, the Business Direct Group consisted of several sub-teams, some responsible for sales and some primarily responsible for maintaining client relations and handling post-sale administrative tasks. (Sharma Aff., ¶ 7). The two categories of employees in the Business Direct Group at that time were called Sales Specialists and Relationship Managers. (Sharma Aff., ¶ 9). Sales Specialists were required to spend two two-hour call periods per day selling to Thomson's clients. (Sharma Aff., ¶ 11). They were expected to place a minimum of 25-40 calls per day. (Sharma Aff., ¶ 11). Additionally, Sales Specialists were required to take calls from existing customers via a "helpline" and direct those calls to the appropriate Thomson Reuters employee. (Sharma Aff., ¶ 12). To do so, they were required to log in to a specific Thomson Reuters phone system. (Sharma Aff., ¶ 12). Finally, Sales Specialists received monthly revenue targets and were expected to make records of their sales calls in a customer relationship management database known as "TRUST" or "salesforce.com." (Sharma Aff., ¶ 13). Their compensation consisted of a base salary and commissions from sales. (Sharma Aff., ¶ 14). In contrast,

4

Relationship Managers provided client-related administrative support to the Sales Specialists. (Sharma Aff., ¶ 15). Their duties could include calls to clients and potential clients, but, unlike Sales Specialists, they were not expected to generate sales revenue or develop client leads through cold-calls. (Sharma Aff., ¶ 15). Their duties did, however, include renewing existing customer contracts. (Sharma Aff., ¶ 16).

When Mr. Sonders and Mr. Sharma hired the plaintiff in 2006, they assigned him the position of Senior Relationship Manager on the New York sales team, where he initially reported directly to Mr. Sharma. (Letter of Mark Sonders dated July 27, 2006 ("Offer Letter"), attached as Exh. F to Boyarsky Aff.; Sharma Aff., ¶ 19; McGrath Dep. at 139-41). His base salary was $50,000 per year plus performance-based bonuses. (Sharma Aff., ¶ 17; McGrath Dep. at 201). At that time, Mr. McGrath was assigned to sell a product called Nelson Directories[3] to Thomson Reuters' academic clients who consisted of colleges and universities. (Sharma Aff., ¶ 20).

In late 2006, the defendant restructured its operations. (Affidavit of Bill Moore dated January 3, 2012 ("Moore Aff."),

_____

[3] According to Thomson Reuters, Nelson Directories "provided data and software to the global institutional investment community and consisted of a product line comprised of proprietary databases and comprehensive hard-copy directories covering the institutional investment industry." (Rule 56.1 Statement, ¶ 34; Sharma Aff., ¶ 21).

attached as Exh. KKK to Boyarsky Aff., ¶ 2). As part of that restructuring, the defendant transferred its academic business from Business Direct to a different division. (Moore Aff., ¶ 2). As a result, Mr. McGrath was transferred in 2007 from the Business Direct Group to a group within Thomson Financial supervised by Bill Moore. (Moore Aff., ¶ 3). In Mr. Moore's group, the plaintiff's job title changed from "Senior Relationship Manager" to "Relationship Manager," because, Thomson Reuters asserts, in that group the title "Senior Relationship Manager" was equivalent to "Sales Specialist" in Business Direct. (Moore Aff., ¶ 5). According to Thomson Reuters, despite the change in title, Mr. McGrath's pay, eligibility for bonuses, benefits, and terms and conditions of employment remained the same. (Moore Aff., ¶ 7). Similarly, the defendant contends that Mr. McGrath remained responsible for calling customers, but his duties no longer consisted only of seeking renewals of hard-copy Nelson Directories. (Moore Aff., ¶ 6). Instead, he became responsible for selling other products to the defendant's academic clients and for providing training support to those clients. (Moore Aff., ¶ 6). According to Mr. McGrath, on the other hand, his new position was "secretarial" in nature and involved no product sales. (McGrath Dep. at 137, 167).

In February 2007, a few weeks after joining Mr. Moore's group,

the plaintiff complained to Mr. Sonders that he did not want to remain there. (Moore Aff., ¶ 11; McGrath Dep. at 137). By March 2007, he transferred back to the Business Direct group and resumed selling Nelson Directories. (McGrath Dep. at 137-38, 174). Upon transferring back, Mr. McGrath retained the job title "Relationship Manager." (Sharma Aff., ¶ 26). Around the same time, Mr. Moore complained in an e-mail about the plaintiff's performance, and indicated that, had Mr. McGrath not been transferred out of the group, he would have placed him on a performance improvement plan ("PIP"). (E-mail from Bill Moore to Mark Sonders dated June 14, 2007 ("Moore E-mail"), attached as Exh. I to Boyarsky Aff.; Moore Aff., ¶ 10).

At some point in 2007, after Mr. McGrath transferred back to the Business Direct Group, he alleges that a co-worker, Iris Ramos, twice referred to him as an atheist. (McGrath Dep. at 217, 227). According to the plaintiff, while he was mourning the recent death of his mother, "[s]omebody approached me to gave [sic] me their condolences, [and] when they walked away, she nastily and maliciously, tete-a-tete, face-to-face, eye-to-eye called me: Charles, you're an Atheist."[4] (McGrath Dep. at 219). Allegedly,

---

[4] At her deposition, Ms. Ramos did not recall such a conversation. (Deposition of Iris Ramos, attached as Exh. A to Plaintiff's Response and Rebuttal of Defendant's Memorandum of Law and Defendant's Local Rule 56.1 Statement dated Feb. 2, 2012, at 6-

this took place in the presence of Mr. Sharma, who "just laughed" when asked by Mr. McGrath to direct Ms. Ramos to cease making such comments.  (McGrath Dep. at 217).  Mr. McGrath maintains that he is not an atheist, but rather an "Agnostic Christian," and that he considers it inherently discriminatory to refer to an agnostic as an atheist.  (McGrath Dep. at 83, 220, 226-27; Deposition of Iris Ramos ("Ramos Dep."), attached as Exh. FFF to Boyarsky Aff., at 16-17, 19).

In mid-2008, the defendant decided to discontinue selling hard-copy Nelson Directories.  (Sharma Aff., ¶ 30).  Due to this, at least one employee, Judy Schneider, was laid off.  (McGrath Dep. at 179-81).  Ms. Schneider was in her early thirties at the time she was terminated.  (McGrath Dep. at 179-81).  Rather than terminating Mr. McGrath, Mr. Sharma offered him a position selling a different product known as Thomson ONE Advisor ("T-ONE").  (Sharma Aff., ¶ 32; McGrath Dep. at 550, 600-02).  T-ONE is "a real-time, integrated research and analytical application designed to monitor and analyze financial market activity."  (Sharma Aff., ¶ 33).

During the fall of 2008, the defendant assigned Mr. McGrath to training on how to sell T-ONE and provided him with multiple lists

---

7, 12-13).

of potential sales leads to call. (McGrath Dep. at 232-36, 554, 647). On October 9, 2008, Mr. McGrath requested three days off from work. (McGrath Dep. at 476; 549-50, 831). Shortly thereafter, he informed the defendant that he had undergone twenty-two surgeries relating to a varicose vein condition in his leg and that he could not return to work as soon as planned.[5] The defendant granted Mr. McGrath medical leave until November 10, 2008, although he apparently remained on leave until November 17. (McGrath Dep. at 210, 399; Leave of Absence Extension Approval Notice dated Oct. 28, 2008, attached as Exh. L to Boyarsky Aff.). Mr. McGrath alleges that December 2008, while he claims he was taking an antibiotic called "Keflex" in relation to his surgery, he experienced bowel problems as a side effect of the medication.[6] According to Mr. McGrath, on one day that month, Mr. Sonders tracked the number of times he used the bathroom by writing a tally on a whiteboard in his office. (McGrath Dep. at 282-83, 312). Later that day, Mr. Sharma spoke privately with Mr. McGrath about

_____

[5] Although Mr. McGrath told the defendant at that time that he had undergone twenty-two surgeries, and initially testified to this at his deposition, he eventually admitted that he in fact had received twenty-two incisions during the course of one surgery. (McGrath Dep. at 397, 508-09, 511-12; Medical Records of Charles McGrath ("Med. Rec."), attached as Exh. K to Boyarsky Aff.). He was also treated separately for an ingrown toenail. (McGrath Dep. at 397, 512; Med. Rec.).

[6] Mr. McGrath's medical records indicate that his Keflex treatment ended in November 2008.

why he was away from his desk.  (McGrath Dep. at 283, 297-98).
According to the plaintiff, he provided the defendant's Human
Resources Department with a doctor's note explaining his condition.
(McGrath Dep. at 297, 538).   The defendant maintains that Mr.
McGrath has presented no evidence that such a note ever existed or
that Mr. Sharma ever saw it and points out that at his deposition,
Mr. McGrath testified to spending time away from his desk
socializing with co-workers.  (Rule 56.1 Statement, ¶¶ 179, 185;
McGrath Dep. at 296-97).

Throughout the fall of 2008, Mr. McGrath failed to make any
sales of T-ONE, and he ultimately received a negative annual
performance review.  (Sharma Aff., ¶ 47; 2008 Performance Review
attached as Exh. P to Boyarsky Aff.).   The performance review was
weighted toward the plaintiff's responsibility for T-ONE sales,
rather than his previous success in selling Nelson Directories.
(Sharma Aff. ¶ 42).   The defendant asserts that this was because
the plaintiff's "performance regarding the hard-copy Nelson
Directories was not relevant given the product was being
discontinued." (Rule 56.1 Statement, ¶ 117; Sharma Aff., ¶ 42).
In a meeting with Mr. Sharma in January 2009 to discuss the
performance review, Mr. McGrath acknowledged that his sales
position was not right for him. (Sharma Aff. ¶ 43). Following the
review, Mr. Sharma began to observe and coach the plaintiff; this

included work to improve his call scripts. (Sharma Aff., ¶ 44; McGrath Dep. at 242-43). Later that month, Mr. Sonders asked him to fill out a "Territory Development Plan" ("TDP") because he was not successfully making sales, but the plaintiff refused to do so. (McGrath Dep. at 634; E-mail of Mark Sonders dated January 31, 2009, attached as Exh. R to Boyarsky Aff.). Approximately a dozen other employees were asked to fill out TDPs at that time, and all except Mr. McGrath complied with the request. (McGrath Dep. at 634, 636; Territory Development Plans and Performance Improvement Plans, attached as Exh. T to Boyarsky Aff.). Despite the training and the TDP, from the fall of 2008 until his termination in November 2009, Mr. McGrath did not make any sales of T-ONE whatsoever. (McGrath Dep. at 109-11, 246, 551).

Within days of receiving his 2008 performance review, Mr. McGrath e-mailed Mr. Sonders and Mr. Sharma to inform them that he was filing an EEOC charge. (E-mail of Charles McGrath dated Jan. 8, 2009, attached as Exh. Q to Boyarsky Aff.; McGrath Dep. at 687-89). In January 2009, Thomson Reuters' Human Resources Department began an internal investigation into whether the plaintiff had faced discrimination or harassment. (Rule 56.1 Statement, ¶ 152; E-mail of Glen Russo dated Jan. 16, 2009, attached as Exh. AA to Boyarsky Aff.). During the course of the investigation, Mr. McGrath met several times with Glen Russo, the defendant's Vice

President of Labor Relations. (Summary of Investigation, attached as Exh. BB to Boyarsky Aff.). Mr. Russo ultimately found no evidence of discrimination, harassment, hostile work environment, or retaliation. (Summary of Investigation).

In mid-April 2009, the defendant issued the plaintiff a "Performance Improvement Plan" ("PIP") as a result of his ongoing failure to make sales. (Sharma Aff., ¶ 51; Performance Improvement Plan dated April 13, 2009, attached as Exh. Y to Boyarsky Aff.). The PIP called for the plaintiff to enter "[a]ll activities, tasks and pipeline" into the Trust database in real time, to generate "one trial request per day (20 per month) which is to be entered into Trust," place 25-40 targeted phone calls per day, and to invite Mr. Sharma to "either participate [in] or observe [the plaintiff's] client meetings/demos to provide coaching." (Performance Improvement Plan).

Two weeks later, on May 1, 2009, Mr. McGrath began his final leave of absence from Thomson Reuters. (McGrath Dep. at 428, 453; Sharma Aff., ¶ 53). He did not provide any documentation regarding his condition directly to Thomson Reuters or to his co-workers or supervisors, and, after May 4, 2009, had no further communication with them. (Sharam Aff., ¶ 54; McGrath Dep. at 896, 920). Mr. McGrath did, however, provide documentation of his medical condition to the defendant's third-party claims administrator.

(McGrath Dep. at 920).   Although the plaintiff was scheduled to return to work on May 19, he did not do so.  (Sharma Aff., ¶ 55). Instead, he requested additional leave by contacting the third-party claims administrator, and was ultimately granted additional leave until May 29, 2009.   (Medical Leave of Absence Approval Notice dated May 28, 2009, attached as Exh. II to Boyarsky Aff.). Mr. McGrath again did not return to work at the end of this period, and instead waited until June 2, 2009 to request further leave. (Sharma Aff., ¶ 54; Confirmation of Leave of Absence Extension Request dated June 2, 2009, attached as Exh. JJ to Boyarsky Aff.). This time, the defendant extended the plaintiff's leave through June 29, 2009.  (Confirmation of Leave of Absence Extension Request dated June 11, 2009, attached as Exh. KK to Boyarsky Aff.).   On June 23, 2009, Mr. McGrath exhausted his leave under the Family Medical Leave Act.   (Letter of Sara McCabe dated June 25, 2009, attached as Exh. MM to Boyarsky Aff.).  Previously, he had received full compensation.  (McGrath Dep. at 433, 460; Pay Stubs, attached as Exh. LL to Boyarsky Aff.).  Thereafter, he received short-term disability benefits at eighty percent of his salary.  (Pay Stubs, attached as Exh. NN to Boyarsky Aff.).

During June and July of 2009, the defendant sent Mr. McGrath multiple letters that included a form requesting further information in order for Thomson Reuters to consider granting him

13

additional leave. (Rule 56.1 Statement, ¶¶ 208, 209, 210, 212). Despite multiple attempts to contact him both by letter and by phone, Mr. McGrath responded only by leaving two voice mails with Thomson Reuters' human resources department -- in the first he stated that he would not provide the requested information, and, in the second, he asserted that his doctor had retired and that he needed time to find a new one. (Rule 56.1 Statement, ¶¶ 209, 211, 213, 214; McGrath Dep. at 888-89, 907-08; Letter of Gregg Aprahamian dated July 21, 2009 ("Aprahamian Letter"), attached as Exh. PP to Boyarsky Aff.; Affidavit of Gregg Aprahamian dated January 4, 2012 ("Aprahamian Aff."), attached as Exh. LLL to Boyarsky Aff., ¶¶ 5, 9). Finally, on July 21, 2009, Thomson Reuters sent the plaintiff a letter stating that it would not grant any further extensions of time for him to return the required paperwork beyond August 13, 2009. (Aprahamian Letter). That letter further indicated that if Mr. McGrath failed to comply, the defendant would replace him. (Aprahamian Letter). Mr. McGrath did not contact Thomson Reuters in any way after July 30, 2009. (Aprahamian Aff., ¶ 15). On October 29, the defendant sent him a letter stating that he would be considered to have abandoned his position unless he contacted the firm by October 30 to discuss his ability to return to work by November 2. (Letter of Sara McCabe dated Oct. 29, 2009, attached as Exh. SS to Boyarsky Aff.). When

14

Mr. McGrath did not respond, Thomson Reuters terminated him on November 5, 2009. (Aprahamian Aff., ¶ 18).

On or about November 1, 2009, the plaintiff shifted from receiving short-term disability benefits to long-term disability benefits. (Letter of Carrie Jones dated Nov. 4, 2009, attached as Exh. VV to Boyarsky Aff.). Mr. McGrath's termination on November 5, 2009 did not interfere with his continued receipt of these benefits, and he continued to receive them until at least the date that the defendant filed this motion for summary judgment. (Rule 56.1 Statement, ¶¶ 235, 236). The plaintiff also obtained a determination by the Social Security Administration that he was fully disabled from April 30, 2009 onwards. (Social Security Administration Notice of Determination dated Aug. 5, 2011, attached as Exh. XX to Boyarsky Aff.). Mr. McGrath has further testified that he was not medically able to return to work after April 30 and that his doctors were unwilling to provide medical certification for him to return to work after that date. (McGrath Dep. at 402, 435, 493-97, 756). He has not alleged the existence of any reasonable accommodation that could have allowed him to return to work, nor has he alleged that he requested any accommodation from the defendant. (Complaint).

Mr. McGrath filed a charge of employment discrimination with the EEOC on June 9, 2009. (Complaint). On March 3, 2010, the EEOC

dismissed his charge and issued a notice of right to sue. (Complaint).  The plaintiff filed his complaint in the instant case on May 13, 2010.

During the course of discovery, Thomson Reuters learned that Mr. McGrath intentionally falsified information on his résumé when he applied to work in 2006.  (McGrath Dep. at 100-01, 114-15, 118-20, 129-31; Letter of Steven A. Moll dated November 28, 2011 ("Moll Letter"), attached as Exh. ZZ to Boyarsky Aff.).  Specifically, the plaintiff purposefully omitted the fact of his employment by Bloomberg in 2000 and claimed to have been a professor at Northeastern University from 1995 until "current" -- i.e. 2006 -- even though he had not taught any classes there or spoken to anybody affiliated with the university since 1999.  (McGrath Dep. at 39, 55, 99-101; Application for Employment of Charles McGrath ("McGrath Application") dated March 23, 2006, attached as Exh. AAA to Boyarsky Aff.).  Additionally, he claimed to be have been a full professor at Northeastern, although the W-2 forms issued by the school in 1997 and 1998 show amounts of compensation -- $3,800 and $3,400, respectively -- that are instead commensurate with employment as adjunct faculty.  (McGrath Dep. at 67; W-2 forms issued by Northeastern University, attached at Exh. CCC to Boyarsky Aff.).  Similarly, Mr. McGrath's application indicated that he had been employed by the New York City Department of Education (the

16

"DOE") as a "teacher" from 2003 through 2006. (McGrath Application). The DOE's employment records with respect to Mr. McGrath reflect that he was actually employed as a substitute teacher, and then only from September 2004 until early 2005. (New York City Department of Education Employment Records, attached as Exh. DDD to Boyarsky Aff.).[7] Thomson Reuters asserts that it

> would not have hired [Mr. McGrath] had it been aware that his resume and employment application contained serious inaccuracies when [he] applied for a position in the 2006, and further would have terminated his employment immediately had [it] been made aware that [he] materially falsified information on his resume and employment application.

(Rule 56.1 Statement, ¶ 262; Moll Letter).

Discussion

A. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002) (citing former Rule 56(c)); see also

---

[7] Furthermore, in both his EEOC charge and the complaint in this case, Mr. McGrath claimed to have been employed by A.G. Edwards, but at deposition he testified that this was not actually the case. (Complaint; McGrath Dep. at 133, 990-91).

Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999) (internal quotation marks omitted).[8]   The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   The opposing party then must come forward with "specific facts showing that there is a genuine issue for trial."   Id. at 324 (internal quotation marks omitted).   Where the nonmovant fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. Id. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).   But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where

---

[8] Rule 56 was amended in 2010.  These cases cite a prior version of Rule 56.  However, the 2010 Amendments did not change the standard for granting summary judgment.  Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendment.

the nonmovant's evidence is conclusory, speculative, or not significantly probative.  <u>Anderson</u>, 477 U.S at 249-50.  "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forth some affirmative indication that his version of relevant events is not fanciful."  <u>Podell v. Citicorp Diners Club, Inc.</u>, 112 F.3d 98, 101 (2d Cir. 1997) (internal quotation marks omitted); <u>see also</u> <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); <u>Goenaga v. March of Dimes Birth Defects Foundation</u>, 51 F.3d 14, 18 (2d Cir. 1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (quoting <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 288 (1968)).

Where a litigant is <u>pro se</u>, his pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest.'"  <u>Fulton v. Goord</u>, 591 F.3d 37, 43 (2d Cir. 2009) (quoting <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001)). Nevertheless, proceeding <u>pro se</u> does not relieve a litigant from

the usual requirements of summary judgment, and a <u>pro</u> <u>se</u> party's "'bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.'" <u>Geldzahler v. New York Medical College</u>, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) (quoting <u>Lee v. Coughlin</u>, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (internal quotation marks omitted)).   But even where, as here, the plaintiff has received notice pursuant to Local Rule 56.2 regarding the requirements for opposing a summary judgment motion, the court may conduct an "'an assiduous review of the record' to determine if there is any evidentiary support for his assertions of fact that do not cite to evidence and to determine if there are any other material issues of fact." <u>Id.</u> (quoting <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001)).

   B. <u>Timeliness</u>

   In general, discrimination claims under Title VII, the ADEA, and the ADA must be filed with the EEOC within 180 days of the date when the alleged unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(A); 42 U.S.C. § 12117(a). However, in states like New York that have their own anti-discrimination laws and enforcement agencies, the limitations period for filing an administrative charge with the EEOC is 300 days.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 626(d)(1)(B),

633(b); 42 U.S.C. § 12117(a); see Petrosino v. Bell Atlantic, 385 F.3d 210, 219 (2d Cir. 2004) (citing Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 133-34 (2d Cir. 2003); Ford v. Bernard Fineson Development Center, 81 F.3d 304, 307 (2d Cir. 1996); Butts v. City of New York Department of Housing Preservation & Development, 990 F.2d 1397, 1401 (2d Cir. 1993). Discrete acts of discrimination, including demotion or termination, cannot be the basis for recovery by a plaintiff if they occurred outside the 300 day period. Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004). Mr. McGrath filed his EEOC charge on June 9, 2009. As a result, his claims with regard to any individual acts of discrimination, harassment, or retaliation are time-barred if the acts occurred prior to August 14, 2008. Thus, Mr. McGrath's religious discrimination claim, which is based entirely on two allegedly discriminatory comments made in 2007 by Ms. Ramos, and his claims relating to his alleged demotion from "Senior Relationship Manager" to "Relationship Manager" in 2007 are both time-barred.

C. Employment Discrimination

Mr. McGrath alleges that the defendant discriminated against him on the basis of his religion, in violation of Title VII, on the basis of his age, in violation of the ADEA, and because of his

disability, in violation of the ADA.   Claims of discrimination under Title VII are analyzed in accordance with the three-part framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   This same framework applies to employment discrimination claims under the ADEA and the ADA. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993) (finding McDonnell Douglas analysis to apply in ADEA cases); Abrahamson v. Board of Education, 374 F.3d 66, 71 (2d Cir. 2004) (same); Parker v. Columbia Pictures, 204 F.3d 326, 332 (2d Cir. 2000) (applying burden shifting analysis to ADA claim).

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination, including that the defendant took one or more adverse employment actions against him.   McDonnell Douglas, 411 U.S. at 802; Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).   Once the plaintiff has established a prima facie case, the burden shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"   St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993) (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)).   Notwithstanding this intermediate shift of the burden of production,   "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the

22

plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253; <u>see also</u> <u>St. Mary's Honor Center</u>, 509 U.S. at 507.

Accordingly, if the defendant provides evidence of legitimate nondiscriminatory reasons for its action, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Burdine</u>, 450 U.S. at 253. Specifically, to oppose a summary judgment motion successfully, a plaintiff must provide "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false," <u>Alam v. HSBC Bank USA</u>, No. 07 Civ. 3540, 2009 WL 3096293, at *8 (S.D.N.Y. Sep. 28, 2009) (quoting <u>Gilligan v. City of Moreau</u>, No. 00-7109, 2000 WL 1608907, at *3 (2d Cir. Oct. 25, 2000) (quotation marks and citation omitted)), and show "'that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" <u>Paul v. Wyeth Pharmaceuticals, Inc.</u>, 326 Fed. App'x 18, 19 (2d Cir. 2009) (quoting <u>Stern v. Trustees of Columbia University in the City of New York</u>, 131 F.3d 305, 312 (2d Cir. 1997)). The issue for the court "is not whether the employer reached a correct conclusion" in taking the employment action, but "whether the employer made a good-faith business determination." <u>Baur v. Rosenberg, Minc, Falkoff & Wolff</u>, No. 07 Civ. 8835, 2008 WL 5110976, at *5 (S.D.N.Y.

Dec. 2, 2008).

Mr. McGrath has failed to establish a prima facie case of discrimination under Title VII, the ADEA, or the ADA. Moreover, to the extent that the defendant took adverse employment actions against him, there is no evidence that these occurred under circumstances giving rise to an inference of discrimination or that Thomson Reuters' motivations were anything other than legitimate.

### 1. Religious Discrimination

In order to make out a prima facie case under Title VII, a plaintiff must establish that (1) he is within a protected group, (2) he was qualified for the job at issue, (3) he was subjected to an adverse employment action, and (4) this action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802; Woodman, 411 F.3d at 76. Here, Mr. McGrath's Title VII claim is based on comments about his religion made to him by Ms. Ramos in 2007 is therefore time-barred. If this claim were timely, Mr. McGrath would have established the first and second elements a prima facie case of religious discrimination. Thomson Reuters concedes that Mr. McGrath's religion -- "Agnostic Christian" -- constitutes a protected classification within the McDonnell framework (Def. Memo. at 23 n.16), and does not appear to dispute that he was qualified for the

24

position he held at the time Ms. Ramos mistakenly referred to him as an "atheist."   As discussed below, the plaintiff has also identified one adverse employment action taken by the defendant, his termination in 2009, but he has failed to provide sufficient evidence to suggest that he was terminated under circumstances giving rise to an inference of discrimination based on his religion.

### 2. Age Discrimination

A prima facie case under the ADEA requires the same elements as for a Title VII claim, except that unlike Title VII, where the plaintiff need only show that discrimination was a "motivating factor" in the employer's decision to take an adverse employment action, under the ADEA, age discrimination must have been a "'but for' cause" of the employer's decision.   Gross v. FBL Financial Services, Inc., 557 U.S. 167, ___, 129 S. Ct. 2343, 2349-51 (2009). Thus, a plaintiff must show that his age was the determining factor and that, absent the employer's discriminatory motive, the adverse employment action would not have occurred.   Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106-07 (2d Cir. 2010).

Here, Mr. McGrath was over the age of forty when Thomson Reuters rehired him in 2006, and is therefore a member of the class of individuals the ADEA protects.   (Def. Memo. at 7; McGrath Dep.

at 13).  The defendant contends, however, that because Mr. McGrath performed unsatisfactorily from September 2008 until the time of his termination, he was not qualified for his position.[9]  (Def. Memo. at 9-10 ).  Although an employee's ongoing failure to perform at the level expected by his employers has at times been held to demonstrate a lack of qualification for the employee's position, see, e.g., Manko v. Deutsche Bank, 554 F. Supp. 2d 467, 478 (S.D.N.Y. 2008), such failure is better analyzed as a legitimate, non-pretextual reason for an employer to take an adverse employment action.  As discussed below, the only adverse employment action Thomson Reuters took against Mr. McGrath was to terminate him.  In light of the plaintiff's lack of sales from late 2008 onwards, his unannounced leave of absence in May 2009, and his complete failure to respond to the defendant's attempts to contact him regarding returning to work, his age was clearly not the but-for cause of his termination.

### 3. Disability Discrimination

In order to establish a prima facie case of disability-based employment discrimination under the ADA, the plaintiff must show

---

[9] For the reasons discussed more fully below, Mr. McGrath's 2009 termination is the only adverse employment action the defendant took against him.  To the extent that any of Thomson Reuters' other actions could theoretically be considered adverse employment actions, Mr. McGrath has offered no evidence that his age was the but-for cause of any of them.

that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.  Reeves v. Johnson Controls World Services, 140 F.3d 144, 149-50 (2d Cir. 1998), superseded by statute on other grounds as stated in Hilton v. Wright, 673 F.3d 120 (2d Cir. 2012).  An employee is disabled within the meaning of the ADA if he suffers a substantial limitation of one or more major life activities.  42 U.S.C. § 12102(1)(A).  The burden of showing that a claimed limitation was substantial rests with the employee. De La Rosa v. City of New York Police Department, No. 09 Civ. 5290, 2010 WL 4177626, at *8 (S.D.N.Y. Oct. 22, 2010).

The defendant contends that prior to May 2009, Mr. McGrath was not disabled within the meaning of the ADA, and that after May 2009, he would not have been able to perform the essential functions of his job even if given a reasonable accommodation. Thomson Reuters also denies the Mr. McGrath suffered any adverse employment action as a result of his disability.  Mr. McGrath has testified that he was not disabled prior to his final leave of absence from Thomson Reuters.  (McGrath. Dep. at 206). Furthermore, the only potential disabilities suffered by him prior to his final leave were an ingrown toenail, a lump "the size of a

golf ball" resulting from a varicose vein problem in his left leg, and bowel problems resulting from the side effects of taking antibiotics.  (McGrath Dep. at 320, 406).  The plaintiff has not presented evidence that any of those conditions substantially limited any major life activities.

After beginning his final leave of absence from Thomson Reuters in May 2009, Mr. McGrath claims to have been disabled such that his doctors refused to authorize him to work at any time.  He has offered no evidence of what, if any, reasonable accommodation might have permitted him to fulfill the essential functions of his job.  Thus, he has failed to satisfy the burden of both production and persuasion as to the existence of some potential reasonable accommodation.  McBride v. BIC Consumer Products Manufacturing Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009).

### 4. Alleged Adverse Employment Actions

Thomson Reuters argues that the plaintiff cannot make out a prima facie case under Title VII, the ADEA, or the ADA because it took no adverse employment action against him.  An adverse employment action must be a "materially adverse change in the terms and conditions of employment." Weeks v. New York State (Division of Parole), 273 F.3d 76, 85 (2d Cir. 2001) (quoting Galabya v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000)),

<u>abrogated on other grounds by</u> <u>National Railroad Passenger Corp. v.</u>
<u>Morgan</u>, 536, U.S. 101 (2002); <u>see also</u> <u>Ongsiako v. City of New</u>
<u>York</u>, 199 F. Supp. 2d 180, 186-87 (S.D.N.Y. 2002) (adopting
"materially adverse" standard to claim of retaliation under ADA).
Such a change "'must be more disruptive than a mere inconvenience
or an alternation of job responsibilities,'" and "'might be
indicated by a termination of employment, a demotion evidenced by
a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material
responsibilities, or other indices . . . unique to a particular
situation.'" <u>Weeks</u>, 273 F.3d at 85 (quoting <u>Galabya</u>, 202 F.3d at
640). An adverse employment action need not include any loss of
monetary compensation. <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>,
263 F.3d 208, 224 (2d Cir. 2001) (adverse employment action where
plaintiff suspended for one week without pay but later reimbursed
for lost wages). I will address in turn each of the five potential
adverse employment actions that are not time-barred.

### a. <u>Performance Improvement Plan</u>

The issuance of a performance improvement plan to an employee
is simply not an adverse employment action. <u>See, e.g.</u>, <u>Weeks</u>, 273
F.3d at 86 ("It hardly needs saying that criticism of an employee
(which is part of training and necessary to allow employees to

develop, improve and avoid discipline) is not an adverse employment action."); <u>Waters v. General Board of Global Ministries</u>, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) ("[T]he issuance of a performance plan and the recommendation that [plaintiff] attend [Employee Assistance Program] counseling do not constitute adverse employment actions."); <u>Szarzynski v. Roche Laboratories</u>, No. 07-CV-6008, 2010 WL 811445, at *7 (W.D.N.Y. March 1, 2010).  Thus, Mr. McGrath's prima facie case cannot rely on the fact that Thomson Reuters issued him a PIP in April 2009.

### b. <u>2008 Performance Review</u>

The issuance of an unsatisfactory performance review can constitute an adverse employment action if there are accompanying adverse consequences affecting the employee's terms of employment. <u>Gibbs v. New York State Department of Taxation and Finance</u>, No. 04 Civ. 905, 2009 WL 754307, at *6 (S.D.N.Y. March 20, 2009); <u>see also</u> <u>Valentine v. Standard & Poor's</u>, 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999).  Here, there is no doubt that Mr. McGrath's 2008 performance review was unsatisfactory, but the record does not show that he suffered any accompanying negative consequences.  Thus the review was not an adverse employment action.

### c. <u>Reassignment of Plaintiff's Clients</u>

Reassignment of the plaintiff's clients while he was on

medical leave in 2009 was not an adverse employment action. Prior to Mr. McGrath's leave, the defendant had already reassigned him from selling Nelson Directories to selling T-ONE. (McGrath Dep. at 550, 600-02; Sharma Aff., ¶¶ 32, 35). Thus, the reassignment of his former Nelson Directory clients to Ms. Lim and Ms. Ramos did not effect "a materially adverse change in the terms and conditions" of his employment. Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006); see also Adams v. Northstar Location Services, No. 09 Civ. 1063, 2010 WL 3911415, at *3 n.2 (W.D.N.Y. Oct. 5, 2010)("The court finds that the denial of plaintiff's access to payroll records and the reassignment of an investigation to another employee do not constitute adverse employment actions . . . .").

### d. Supervision by Mr. Sharma

Close scrutiny of an employee by his supervisor is not an adverse employment action. See, e.g., Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) (holding that "micro-management" and "excessive scrutiny" are not adverse employment actions, especially where only evidence was plaintiff's "own perception that she was treated differently"). The plaintiff here has testified that Mr. Sharma closely monitored his job performance and intervened in that performance in potentially intrusive ways. He has not, however, presented any evidence that these

31

interventions resulted in a materially adverse change in the conditions of his employment.  Moreover, Mr. McGrath testified at his deposition that he valued Mr. Sharma's assistance and training. (McGrath Dep. at 242-43).

### e. Termination

Termination is normally an adverse employment action.  <u>See</u> <u>Williams v. R.H. Donnelley Corp.</u>, 368 F.3d 123, 128 (2d Cir. 2004) (citing <u>Galabya</u>, 202 F.3d at 640).  Thomson Reuters contends that the plaintiff's abandonment of his position was the sole reason for his termination and that, as a result, his termination "cannot constitute an adverse employment action" (Def. Memo. at 19), but the sole case it cites to support that proposition, <u>Quinones v.</u> <u>C.L.B. Check Cashing, Inc.</u>, No. 07 Civ 281, 2008 WL 5147029, at *5 (S.D.N.Y. Dec. 4, 2008), is inapposite. Unlike Mr. McGrath, the plaintiff in <u>Quinones</u> was never formally terminated by her employer.  Indeed, <u>Quinones</u> states that a plaintiff who, like Mr. McGrath, refuses to complete necessary paperwork and is therefore barred from returning from leave has suffered an adverse employment action, albeit one justified on non-discriminatory grounds.  Thus, Mr. McGrath has successfully identified one adverse employment action taken against him by Thomson Reuters: his termination.

### 5. Inference of Discrimination

One traditional way for a plaintiff to establish an inference of discrimination is to show that the employer "treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000). Because an employer engaged in discrimination is unlikely to leave a "smoking gun," Forsyth v. Federation Employment and Guidance Service, 409 F.3d 565, 569 (2d Cir. 2005), a plaintiff usually must rely on the "cumulative weight of circumstantial evidence" when proving bias, Walker v. New York City Department of Corrections, No. 01 Civ. 1116, 2008 WL 4974425, at *10 (S.D.N.Y. Nov. 19, 2008) (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)). Here, Mr. McGrath has not demonstrated that his termination resulted from bias or that similarly situated employees were ever treated more favorably. With respect to religious discrimination, there is nothing to suggest that Ms. Ramos' stray comments in 2007 bear any relationship to Mr. McGrath's termination two years later. With respect to age discrimination, Thomson Reuters has identified a younger employee, Jean-Claude Moos, who was terminated in 2009 for poor sales performance even when the defendant continued to employ Mr. McGrath despite his total lack of sales. (Sharma Aff., ¶ 57). With respect to disability discrimination, Mr. McGrath has not identified any individual

33

granted an indefinite leave of absence, whether because of a disability or otherwise.

### 6. Legitimate Reasons for Defendant's Actions

Even if Mr. McGrath had made out a prima facie case, Thomson Reuters has presented legitimate reasons for all five of its purported adverse employment actions that Mr. McGrath has timely raised, including his termination. The plaintiff, in turn, has presented no evidence that those justifications are merely pretextual.

### a. Reassignment of Clients

Thomson Reuters argues that its decision to reassign Mr. McGrath's Nelson Directory accounts while he was on medical leave was intended not to penalize the plaintiff but to cover his account while he was one leave and to expedite sales of the remaining Nelson Directories prior to their discontinuance. (Sharma Aff. ¶ 36). Furthermore, after the plaintiff returned from his medical leave, he was both assigned to sell a different product, T-ONE, which did not face elimination, and to handle the last Nelson Directory sales. (Sharma Aff. ¶¶ 39, 40). Even if reassigning Mr. McGrath's accounts to co-workers during his leave were an adverse employment action, it is clear that Thomson Reuters has presented a legitimate business reason for that action.

34

b. <u>Unsatisfactory 2008 Performance Review</u>

The defendant claims that the unsatisfactory performance review issued to Mr. McGrath in 2008 was based on the combination of his ongoing failure to log his activities properly or make sales of the T-ONE product to which he was assigned after Thomson Reuters discontinued selling Nelson Directories. (Sharma Aff., ¶¶ 47, 49; McGrath Dep. 110, 262). The only potential evidence that this rationale is pretextual is the fact that the review was weighted such that the plaintiff received less recognition for his success at selling Nelson Directories that for his failure to make any T-ONE sales. Thomson Reuters has, however, presented unrebutted proof that the decision to weight the review towards Mr. McGrath's more recent sales performance was based on the fact that they no longer sold the Nelson Directories. (Sharma Aff., ¶ 42).

c. <u>2009 PIP</u>

Assuming that the issuance of a PIP were an adverse employment action, the same analysis would apply here as to Mr. McGrath's unsatisfactory performance review; his ongoing failure to make sales or properly log his activities presented a legitimate, non-discriminatory reason for the defendant to issue him a PIP.

d. <u>Supervision by Mr. Sharma</u>

The defendant contends that Mr. Sharma's "efforts to meet with

[the] Plaintiff, review his sales techniques, practice scripts[,] and review sales performance cannot be objectively interpreted as anything other than support and assistance." (Def. Memo. at 31). While it is conceivable that a plaintiff might be able to demonstrate that close supervision was actually intended to interfere with his performance or establish a paper trail to justify a pretextual termination, Mr. McGrath cannot do so here because he testified that he believed Mr. Sharma sincerely intended to improve his sales performance. (McGrath Dep. at 242-43). Thus, he has conceded that Thomson Reuters' justification for Mr. Sharma's actions is not a pretext.

e. <u>Termination</u>

Thomson Reuters claims its decision to terminate Mr. McGrath occurred in response to his effective abandonment of his position. Employers may take adverse actions against employees who have been absent from their positions for an extended period of time.   <u>See e.g.</u>, <u>Carter v. New Venture Gear, Inc.</u>, 310 Fed. App'x 454, 457 (2d Cir. 2009) ("[Defendant] has met its burden of articulating a legitimate, non-discriminatory reason for its actions, namely, [plaintiff's] . . . extended absences . . . ."). Here, Mr. McGrath's final leave of absence began, unannounced, in May 2009 and he repeatedly failed to respond to the defendant's requests for

information necessary to grant him leave or further extend leave time already granted.  At the same time, the defendant did not terminate Mr. McGrath until several months after his FMLA leave expired and apparently would have granted him further leave had he responded to their repeated inquiries.  Mr. McGrath's failure to respond to those inquiries and his months-long absence from his position are legitimate reasons for Thomson Reuters to terminate him.

    D. Hostile Work Environment

    A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . ." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." Id.  The plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have materially altered

the conditions of his working environment.   Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989)); see also Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).

When evaluating whether a hostile work environment exists, courts must look at "all the circumstances," including "the frequency of the [retaliatory] conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.  "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that . . . the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks and emphasis omitted). "The environment need not be unendurable or intolerable." Id. (internal quotation marks and citation omitted).

Mr. McGrath has three hostile work environment claims. First, he argues that Ms. Ramos' references to him as an atheist were offensive.  Second, he claims that one of his supervisors, Mr. Sonders, repeatedly harassed him about his age.  Finally, he alleges

that he was the subject of name calling and derogatory remarks about the condition of his leg.  I will address each claim in turn.

### 1. Religion Comments

Mr. McGrath cannot successfully demonstrate that he was subject to a hostile work environment based on his religion.  His claim is premised on Ms. Ramos' references to him as an atheist, but her comments were not objectively abusive, disparaging, or coercive, notwithstanding the fact that Mr. McGrath finds being misidentified as an atheist subjectively offensive.  Meritor Savings Bank, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' within the meaning of Title VII."); Ennis v. Sonitrol Management. Corp., No. 02 Civ. 9070, 2006 WL 177173, at *10 (S.D.N.Y. Jan. 25, 2006) ("[C]onduct involving religion will not be held to create a religious hostile work environment unless that conduct is in some way abusive, disparaging, or coercive with respect to the plaintiff" even if the conduct is "unpleasant or disturbing").  Even if Ms. Ramos' misidentification had been disparaging, two stray comments are not sufficiently severe or pervasive to create a hostile work environment.  See Faison v. Leonard St., LLC, No. 08 Civ. 2192, 2009 WL 636724, at *3 (S.D.N.Y. March 9, 2009) (dismissing religion-based hostile work environment claims where "[t]he Amended Complaint

allege[d] one remark by [defendant] that raised the issue of the plaintiff's religion").

### 2. Age Comments

As with Ms. Ramos' comments, Mr. Sonders' comments about the plaintiff's age did not create a hostile work environment. According to Mr. McGrath, Mr. Sonders called him "old man" repeatedly over an extended period of time, but he did not feel harassed by those comments until some time in 2007 or early 2008, at which point he perceived Mr. Sonders' demeanor as having changed to become hostile.  (McGrath Dep. at 420, 772-73).  Because a plaintiff must show "not only that [he] subjectively perceived the environment to be abusive but also that the environment was objectively hostile and abusive," Sims v. City of New York, No. 08 Civ. 5865, 2010 WL 3825720, at *11 (S.D.N.Y. Sept. 30, 2010), Mr. McGrath's perception that Mr. Sonders' demeanor changed is insufficient on its own to support a hostile work environment claim, and he has presented no evidence to suggest that the purported change in Mr. Sonders' demeanor materially altered the objective terms or conditions of his employment.  Similarly, the plaintiff's ability to do his job was unaffected by the allegedly hostile environment created by Mr. Sonders; Mr. McGrath's performance began to decline in the fall of 2008 and reached its nadir after January

2009, a time when he testified that Mr. Sonders did not speak to him
at all, much less harass him about his age.  (McGrath Dep. at 542-
43).

### 3. Disability-related Hostility

Although the Second Circuit has not expressly ruled that the
ADA permits a hostile work environment claim based on disability,
several courts in this district have recognized such claims.  See,
e.g., Farin v. Branford Board of Education, No. 10-4347-cv, 2011 WL
5607603, at *3 (2d Cir. Nov. 18, 2011) ("Even assuming, arguendo,
that the ADA provides a basis for a hostile work environment claim
(an issue this Court has not yet decided), the record is devoid of
evidence suggesting that [the plaintiff] was disabled within the
meaning of the ADA . . . ."); Scott v. Memorial Sloan-Kettering
Cancer Center, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002) (equating
ADA standard for hostile environment claims to that of Title VII);
Disanto v. McGraw-Hill, Inc./Platt's Division, No. 97 Civ. 1090,
1998 WL 474136, at *5 (S.D.N.Y. Aug. 11, 1998).  As the ADA only
prohibits discrimination "because of" a disability, proof of
causation is required.  42 U.S.C. § 12112(a).

Construing the facts in the light most favorable to Mr. McGrath
for purposes of summary judgment, it remains the case that
"'[s]imple teasing, offhand comments, or isolated incidents of

offensive conduct'" are insufficient to establish a hostile work environment. <u>Smith v. Regional Plan Assocation</u>, No. 10 Civ. 5857, 2011 WL 4801522, at *6 (S.D.N.Y. Oct. 7, 2011) (quoting <u>Petrosino</u>, 385 F.3d at 223). Here, Mr. Sonders telling the plaintiff that "you have gangrene" and "your leg is going to fall off" (McGrath Dep. at 213-15) is insufficient to create an objectively hostile work environment. Although Mr. McGrath characterized Mr. Sonders' demeanor as "malicious," the statements themselves do not suggest hostility on Mr. Sonders's part. (McGrath Dep. at 214-15). Such ambiguous statements are not extreme enough to amount to a change in the terms and conditions of employment. <u>See, e.g.</u>, <u>De La Cruz v. City of New York</u>, 783 F. Supp. 2d, 622, 644-45 (S.D.N.Y. 2011) (allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and supervisor's stray remarks regarding seniority and physical fitness insufficient to establish hostile work environment). Similarly, although Mr. Sonders once tracked the number of times that the plaintiff left his desk to use the bathroom in a manner that could be construed as intended to publicly humiliate the plaintiff. Mr. McGrath's own deposition testimony makes clear that this was an isolated incident. Once Mr. Sonders was made aware that the plaintiff was using the bathroom repeatedly because of the side effect of an antibiotic, he ceased tracking the plaintiff's bathroom use.

42

E. <u>Retaliation</u>

To establish a prima facie case that Thomson Reuters retaliated against him for threatening to file an EEOC charge, Mr. McGrath would need to show that: (1) he participated in a protected activity; (2) Thomson Reuters was aware of that activity; (3) he was subjected to an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action. <u>Matya v. United Refining Co.</u> 323 Fed. App'x 65, 67 (2d Cir. 2009) (discussing Title VII); <u>Weissman v. Dawn Joy Fashions, Inc.</u>, 214 F.3d 224, 234 (2d Cir. 2000) (quoting <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 159 (2d Cir. 1999)) (discussing ADEA); <u>see also</u> <u>Holtz</u>, 258 F.3d at 79; <u>Blanco v. Brogan</u>, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009).   An adverse employment action is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

The only adverse employment action attributable to Thomson Reutuers after it became aware of Mr. McGrath's intent to file an EEOC charge was his termination in November 2009.  The plaintiff's

retaliation claim founders on the causation requirement; he has failed to proffer any evidence that his termination resulted from his decision to file an EEOC charge.  There are two ways Mr. McGrath could establish the necessary causal connection: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Board of Education, 232 F.3d 111, 117 (2d Cir. 2001). Mr. McGrath has failed to meet either standard.  He has presented no direct evidence of retaliatory animus on the part of Thomson Reuters or of the disparate treatment of colleagues who engaged in similar conduct.  And there can be no indirect inference of a causal link between the plaintiff's protected activities and his termination because the termination occurred eleven months later, rendering it too remote in time from when he threatened to file his EEOC charge.  See Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); see also Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (protected activity and alleged retaliation must be "very close" for plaintiff to rely on temporal proximity alone).  In general, periods of longer than two months do not support the inference of a causal connection.  See, e.g.,

<u>Stoddard v. Eastman Kodak Co.</u>, 309 Fed. App'x 475, 480 (2d Cir. 2009); <u>Ruhling v. Tribune Co.</u>, No. 04 Civ. 2430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.").

<u>Conclusion</u>

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

45

Dated:     New York, New York
           April 30, 2012


Copies mailed this date to:


Charles F. McGrath, Jr.
9615 Shore Road, Apt. 5B
Brooklyn, New York 11209

Mitchell Boyarsky, Esq.
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701